**Otis PETERKIN, et al., Plaintiffs,**

**v.**

**Glen JEFFES, Commissioner Bureau of Corrections, et al., Defendants.**

**Civ. A. No. 83–304.**

United States District Court,
E.D. Pennsylvania.

May 4, 1987.

Stefan Presser, American Civil Liberties Union, Philadelphia, Pa., for plaintiffs.

Maria Parisi Vickers, Sr. Deputy Atty. Gen., Philadelphia, Pa., for defendants.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

This is a class action in which individuals under sentence of death and currently confined to "death rows" at Pennsylvania's Correctional Institutions at Graterford and Huntingdon challenge the conditions of their confinement under the Eighth Amendment to the United States Constitution. The inmates also challenge restrictions on their first amendment right to the free exercise of religion and their sixth amendment right to access to courts. Original jurisdiction is vested in this court by 28 U.S.C.A. § 1343 (West Supp.1986).

There were eleven days of hearings including two days of testimony at Graterford, at which death row inmates from both Graterford and Huntingdon testified. In addition, the court visited the Restricted Housing Unit (RHU) at Graterford on two occasions, first in June, 1986, and then again in December, 1986. The court also heard extensive testimony about the conditions of confinement in the RHU at Huntingdon. This Memorandum of Decision represents my findings of fact and conclusions of law.

For the reasons that follow, I find that the conditions of confinement for capital inmates at Graterford and Huntingdon are not constitutionally infirm. Similarly, I find that the plaintiffs have failed to establish a violation of their first or sixth amendment rights.

### I. Parties

#### A. Plaintiffs

By order dated June 2, 1986, the court certified the plaintiff class to represent all inmates under sentence of death and confined to administrative segregation at the State Correctional Institutions at Graterford, Huntingdon, and Pittsburgh during the pendency of this litigation.

#### B. Defendants

The defendants in this action, named individually and in their official capacities, are: Glen Jeffes, Commissioner of the Bureau of Corrections of the Commonwealth of Pennsylvania and Superintendent of the State Correctional Institution at Graterford; Charles H. Zimmerman, Superintend-

ent of the State Correctional Institution at Huntingdon; and George Petsock, Superintendent of the State Correctional Institution at Pittsburgh.

## II. *Role Of The Courts In Eighth Amendment Challenges*

■ The eighth amendment prohibits prison conditions that inflict cruel and unusual punishment. It is well established, however, that incarceration necessarily entails the withdrawal or limitation of rights and privileges. *Hudson v. Palmer*, 468 U.S. 517, 524, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393 (1984). Indeed, sentenced inmates may even be subject to punitive conditions. *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979). The eighth amendment applies to this case because confinement in a state penitentiary is subject to eighth amendment scrutiny. *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 1083–84, 89 L.Ed.2d 251 (1986).

*Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), represents the first Supreme Court decision to set the boundaries of an eighth amendment challenge to the conditions of confinement. Drawing on a long line of eighth amendment decisions, the Court in *Rhodes* held that the eighth amendment proscribes conditions that result in an "unnecessary and wanton" infliction of pain, including practices that are "totally without penological justification." *Id.* at 346, 101 S.Ct. at 2399 (citing *Gregg v. Georgia*, 428 U.S. 153, 173, 183, 96 S.Ct. 2909, 2925, 2929, 49 L.Ed.2d 859 (1976)).

The *Rhodes* Court construed the eighth amendment to permit punitive conditions that are compatible with "the evolving standards of decency that mark the progress of a maturing society," but that are not "grossly disproportionate to the severity of the crime." *Id.* at 346, 101 S.Ct. at 2399 (citations omitted). The Court also held that the eighth amendment does not mandate comfortable prisons. *Id.* at 349, 101 S.Ct. at 2400. Rather, the Court concluded that "restrictive" and even "harsh" conditions are a penalty criminal

offenders must pay for their offenses against society. *Id.* at 347, 101 S.Ct. at 2399.

■ In deciding eighth amendment cases, a federal court is not authorized to interfere with the policy choices of state officials concerning the operation of prisons. In *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court explained its policy of deference:

> As we said in *Rhodes v. Chapman*, "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners inter se, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgement of the prison officials in this context, like that of those making parole decisions, turns largely on "purely subjective evaluations and on predictions of future behavior," indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution.

*Id.* at 474, 103 S.Ct. at 872–873 (citations omitted). At the same time, this policy of broad deference does not divest a court of its authority to remedy genuine constitutional violations. *Rhodes v. Chapman*, 452 U.S. at 347, 101 S.Ct. at 2399. Nevertheless, it does require that, absent a constitutional violation, a court grant wide ranging deference to the expertise of prison officials in deciding how to best administer their prisons. *See Whitley*, 106 S.Ct. at 1085 (1986); *Youngberg v. Romeo*, 457 U.S. 307, 322 & n. 29, 102 S.Ct. 2452, 2461

& n. 29, 73 L.Ed.2d 28 (1982). *See also Harris v. Pernsley*, 755 F.2d 338, 349 (3d Cir.) (Garth, J., dissenting), *cert. denied*, —— U.S. ——, 106 S.Ct. 331, 88 L.Ed.2d 314 (1985).

In discharging its constitutional duty, a court faced with an eighth amendment challenge to the conditions of confinement must consider the challenged conditions "alone or in combination," recognizing that the totality of the conditions "may deprive inmates of the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399. Concurring in *Rhodes*, Justice Brennan wrote that "[e]ven if no single condition of confinement would be unconstitutional in itself, 'exposure to the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment.'" *Id.* at 363, 101 S.Ct. at 2407 (quoting *Laaman v. Helgemoe*, 437 F.Supp. 269, 322–23 (D.N.H.1977)) (Brennan, Blackmun & Stevens, JJ., concurring).

■ ■ What emerges from these pronouncements is not a static test; the necessary determinations are imprecise and indefinite. *Id.* at 346, 361. Rather, the eighth amendment must be interpreted in a flexible and dynamic manner. *Id.* at 345. Also, a court must look to objective factors as much as possible. *Id.* at 346. Appropriate objective factors include basic human needs such as food, shelter, and medical care, as well as sanitation, safety, the physical plant, educational/rehabilitational programs, the length of confinement, and out-of-cell time. The opinions of experts, while helpful, "simply do not establish the constitutional minima." *Id.* at 348 n. 13 (citation omitted). In the end, the court must "rely upon its own expertise and on its own knowledge of contemporary standards." *Id.* at 364 (Brennan, Blackmun & Stevens, JJ., concurring) (citation omitted).

I address each of the myriad aspects of confinement in light of the foregoing principles. Since *Rhodes v. Chapman* instructs me to consider each aspect alone or in combination, I will address the issues serially to determine whether, taken alone, they establish a constitutional violation. After reviewing each separately, I will determine whether the cumulative impact of the challenged conditions rises to the level of an eighth amendment violation.

## III. *Pennsylvania's Correctional System*

### A. *Penal Institutions*

The Pennsylvania correctional system consists of ten institutions of varying degrees of security. Tr. 7/29/86: 6–7.[1] Additionally, the Commonwealth utilizes fifteen community service centers. *Id.* The prison population totals approximately 15,000 inmates, and the Commonwealth employs in excess of 4,000 people to operate its correctional facilities. *Id.* For the fiscal year 1986, the Commonwealth allocated $200 million dollars for prison operations. *Id.* Since the reinstitution of the death penalty in 1978, three institutions have housed capital inmates: Graterford, Huntingdon, and Pittsburgh. At present, all of Pennsylvania's capital inmates are housed either at Graterford or Huntingdon.

### 1. *State Correctional Institution at Graterford*

Graterford is a maximum security institution situated on approximately 1700 acres of land, 65 of which are enclosed by a wall that spans approximately one mile. Tr. 7/28/86: 101. The prison itself consists of five cellblocks, each more than 600 feet long. *Id.* The RHU at Graterford is a fairly modern building, separate from the main building containing the five primary cellblocks. It is a one-level, U-shaped structure. Tr. 6/16/86: 16–17. One wing of the RHU houses only capital inmates, the middle wing houses both disciplinary and capital inmates, while the third wing houses inmates with psychiatric problems. *Id.* Graterford is not an accredited correc-

---

**1.** For purposes of referring to the trial transcript, I will use the following nomenclature: Tr. X/X/XX: X. "Tr." designates the trial transcript. The numbers preceding the colon designate the date of the trial testimony. The numbers following the colon are page references. Thus, "Tr. 7/29/86: 6–7" refers to the trial testimony of July 29, 1986, at pages 6–7.

tional institution.[2] Tr. 7/28/86: 100; Tr. 7/29/86: 104–05.

Nearly 2600 inmates are confined at Graterford. Tr. 6/27/86: 65–66; Tr. 7/28/86: 115. Of this population, 17% are serving life sentences. Tr. 7/28/86: 101. The RHU has a maximum capacity of thirty-six inmates, but Graterford houses only about twenty capital inmates. Tr. 6/27/86: 73; Tr. 7/28/86: 116. Generally, the Commonwealth houses capital inmates with significant psychiatric histories at Graterford due to its proximity to Pennsylvania's only maximum security psychiatric hospital, Farview State Hospital. Tr. 6/27/86: 89.

Graterford employs 650 people, of which 400 are correctional officers. Tr. 7/28/86: 101. The RHU requires a disproportionate number of these correctional officers to manage its inmate population. Specifically, the RHU requires between four and eight correctional officers for the day and afternoon shifts, while the night shift requires between two and three officers. Tr. 6/18/86: 35; Tr. 7/28/86: 115–16, 130–31. Correctional officers walk through the RHU every thirty minutes to an hour. Tr. 6/18/86: 35.

### 2. State Correctional Institution at Huntingdon

Huntingdon is a medium/maximum security institution. Tr. 6/27/86: 4. Its layout patterns a "hub" and "spoke" concept, where the hub is the center of the institution and the spokes, six in all, are the cellblocks. *Id.* at 4–5. A large wall surrounds the entire facility, and two modular units, which also house inmates, are located outside the wall. *Id.* at 4. The Commission on Accreditation and Corrections accredited Huntingdon in 1984. Tr. 6/18/86: 140; Tr. 6/27/86: 5–6.

The general prison population at Huntingdon consists of slightly more than 2000 inmates. Tr. 6/26/86: 22, 101; Tr. 6/27/86: 4. Only 1179 cells are available, however, so the institution is presently operating at maximum capacity. Tr. 6/27/86: 4–5.

One cellblock, referred to as "B" block, serves as the RHU. Tr. 6/26/86: 112; Tr. 6/27/86: 5. An RHU annex adjoins the "B" block. Tr. 6/26/86: 114. Cells in the RHU are located in the center of the cellblock. Unlike Graterford, the cells at Huntingdon are stacked on top of one another, three tiers high. Tr. 6/18/86: 37; Tr. 6/26/86: 109.

The RHU at Huntingdon houses between 145 and 150 inmates; another 90 inmates are kept in the RHU annex. Tr. 6/26/86: 141; Tr. 6/27/86: 5. Of this population, forty-two are capital inmates. Tr. 6/26/86: 111; Tr. 6/27/86: 13–14.

Huntingdon employs 450 people, of which 250 are correctional officers. Tr. 6/27/86: 7–8. Like the RHU at Graterford, the RHU at Huntingdon requires a disproportionate number of correctional officers to manage its population. *Id.* Both the day and afternoon shifts require between eight and twelve correctional officers, although the night shift requires only two correctional officers. Tr. 6/27/86: 8.

### 3. State Correctional Institution at Pittsburgh

The oldest prison in Pennsylvania, the Correctional Institution at Pittsburgh is a maximum security prison built in 1882. Tr. 7/29/86: 117–118. It is situated on twelve acres of property in downtown Pittsburgh, and houses approximately 1,600 inmates. *Id.* The prison employs 450 staff, of which 235 are correctional officers. *Id.*

---

**2.** Accreditation is the process by which the Commission on Accreditation and Corrections, which is endorsed by the American Correctional Association (ACA), evaluates an institution's fitness with regard to over 450 standards embracing every aspect of institutional life. Tr. 6/27/86: 7; 7/28/86: 98. These standards are divided into three categories: mandatory (100% of which must be satisfied for accreditation);

essential (90% of which must be satisfied for accreditation); and important (80% of which must be satisfied for accreditation). Tr. 6/18/86: 141–42; Tr. 6/27/86: 7; Tr. 7/29/86: 105. Graterford officials plan to apply for "candidacy status," which is the initial step toward accreditation, in the fiscal year 1986–1987. Tr. 7/28/86: 100; Tr. 7/29/86: 104–05.

Pittsburgh is currently undergoing structural improvements, and for this reason the Commonwealth does not presently have any capital inmates there. Tr. 7/28/86: 102. Prison officials intend to house capital inmates at Pittsburgh upon completion of the ongoing construction. Details of the construction and planned relocation of capital inmates to Pittsburgh are discussed below.

## B. *New Construction*

Defendant Glen Jeffes, Commissioner of the Pennsylvania Department of Corrections, testified that the Commonwealth of Pennsylvania is currently undertaking a $300 million dollar prison construction and renovation program. Tr. 7/29/86: 11–12. Once complete, the project will create more than 3,000 new beds, which will be divided among two state hospitals that are being converted to state correctional facilities, two new penitentiaries, and a new diagnostic/medical unit that is under construction at Graterford. *Id.*

### 1. *Impact of New Construction on Graterford*

As a part of the planned construction, the Commonwealth intends to build the aforementioned medical unit and a new RHU at Graterford. Tr. 7/29/86: 12. The new RHU will consist of 104 beds, 28 outside recreation areas, and 5 day rooms. *Id.* Once construction is complete, the Commonwealth plans to phase out the present RHU, unless overcrowding dictates otherwise. *Id.* at 12, 36–37. State officials project a completion date of mid–1988. *Id.* at 13.

### 2. *Impact of New Construction on Huntingdon*

The Commonwealth is not planning any construction that will affect the RHU at Huntingdon. *Id.* at 37–38. The Commonwealth is, however, allocating one million dollars to renovate the existing medical facility at Huntingdon. *Id.* at 13. The Commonwealth intends to continue housing capital inmates at Huntingdon, despite the construction of new RHU's at Graterford and Pittsburgh. *Id.* at 37.

### 3. *Impact of New Construction on Pittsburgh*

The Commonwealth is close to completing construction of the new RHU at Pittsburgh. Tr. 7/28/86: 102; Tr. 7/29/86: 13. At trial, Commissioner Jeffes estimated completion by late 1986. Tr. 7/29/86: 13, 16. Twenty-four cells in the new RHU will be designated for capital inmates *Id.* Further, the new RHU will have one day room for every eight cells. Some of the capital inmates presently confined at Huntingdon will be transferred to Pittsburgh upon completion of the RHU. Tr. 6/27/86: 31.

## C. *Segregation of Capital Cases*

Pennsylvania reinstated capital punishment in September, 1978. *See* 42 Pa.Cons. Stat.Ann. § 9711 (Purdon 1982). The Commonwealth did not decide to segregate capital inmates from the general prison population, however, until November, 1982. At that time, then Commissioner of Corrections Roland Marks ordered that all capital inmates be transferred from the general prison population to administrative segregation in the RHU's of Graterford, Huntingdon, and Pittsburgh. Ex. D–43; Tr. 6/27/86: 9. Commissioner Marks premised this policy on the inability of prison officials to adequately supervise capital inmates in the general prison population and on the attendant security problems. Ex. D–43.

There is an abundance of evidence in the record supporting the decision to segregate capital inmates. *See* Tr. 6/27/86: 9–11; Tr. 7/28/86: 102–04; Tr. 7/29/86: 8–9, 28, 126; Ex. D–1 & D–44. Moreover, the plaintiffs do not challenge the decision to segregate capital inmates. Tr. 11/7/86: 3. The decision to segregate is only relevant to this action in that it serves as a benchmark to determine how long some capital inmates have resided on death row, which exceeds four years in some cases. Because of the dilatory effect of the legal and political predicates to the implementation of the death penalty, I expect the average length

of confinement and capital inmate population to continue to grow substantially in the years to come.

## IV. *Challenges To The Physical Plant At Graterford And Huntingdon*

A primary part of the plaintiffs' challenge to the conditions of confinement concentrates on limitations in the physical plants of Graterford and Huntingdon.

### A. *Square Footage of the Cells*

Plaintiffs argue that the square footage of the cells, combined with the amount of time spent in the cells, jeopardizes their physical and mental health. Further, plaintiffs maintain that the usable square footage, that is the space available taking into account in-cell trappings such as a bed and sink/toilet fixture, falls far below acceptable standards. The Commonwealth, on the other hand, contends that the cells provide sufficient space and thus do not pose a health hazard.

The cells in the RHU at Graterford and Huntingdon measure sixty and seventy-one square feet per cell respectively. Tr. 6/17/86: 12; Tr. 6/18/86: 119, 131. The cells planned for the new RHU at Graterford measure sixty square feet as well. Tr. 7/29/86: 16. Taking into account the bed and sink/toilet fixture, the cells at Graterford and Huntingdon provide thirty-eight and forty-six "usable" square feet respectively. Tr. 6/17/86: 12; Tr. 6/18/96: 121, 131.

The plaintiffs adduced testimony from their expert in environmental health, Curtis A. Golden, that cell size affects the likelihood of contracting respiratory diseases. Tr. 6/18/86: 120. Based on a Department of Defense study of servicemen residing in troop barracks, Golden testified that when the available space per person is "significantly" less than sixty square feet per person, an increased incidence of respiratory infection results. *Id.* at 120–21.

The Commonwealth's expert in environmental health, Harry Steigman, disputed Golden's reliance on the Defense Department study. Tr. 7/30/86: 22–23. Steigman argued that the conditions in that study are considerably different than those found at Graterford and Huntingdon. *Id.* He noted that the inmates in the study share a large, common space, whereas the inmates on death row each occupy their own cell. *Id.*

On the issue of cell size, the applicable American Correctional Association (ACA) standard recommends eighty square feet per cell. Tr. 6/18/86: 119. The standard is not mandatory, however. *Id.* at 147. Moreover, numerous courts have held that recommendations by experts regarding desirable or ideal space allotments do not constitute constitutional minima. *Rhodes,* 452 U.S. at 348–50 & n. 13, 101 S.Ct. at 2400–01 & n. 13; *Union County Jail Inmates v. DiBuono,* 713 F.2d 984, 999 & n. 24 (3d Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984); *Hoptowit v. Ray,* 682 F.2d 1237, 1248–49 (9th Cir.1982) (followed in *DiBuono* ). In *Rhodes,* which held that the practice of double celling long term inmates did not constitute cruel and unusual punishment, the Court described an expert's recommendation calling for fifty to fifty-five square feet per inmate as merely aspirational. 452 U.S. at 348–49, 101 S.Ct. at 2400. The Court concluded that, considered alone, the fact that the conditions provide less space than the aspirational goal falls "far short" of proving cruel and unusual punishment. *Id.* at 348, 101 S.Ct. at 2400.

█ Plaintiffs challenge to the size of the cells fails for several reasons. First, the cells at Graterford, which are smaller than those at Huntingdon, measure sixty square feet. In *Rhodes,* the Court dismissed an eighth amendment challenge even though the cells provided only thirty-five square feet per inmate. 452 U.S. at 340, 101 S.Ct. at 2395. Second, plaintiffs argument fails because there is no proof that the existing cells have injured the plaintiffs. Plaintiffs hypothesize an injury by relying on the Department of Defense study, yet the relevance of the study to the conditions of confinement on Pennsylvania's death row is tenuous at best. The conditions in that study were substantially different, and even plaintiffs' expert testi-

fied that the study only applied to situations where "you have space *significantly* less than 60 square feet per person," which is not the case here. Tr. 6/18/86: 120–121 (emphasis mine). Nor did plaintiffs introduce any evidence of the proliferation of respiratory disease, despite the fact that capital inmates have resided under these conditions for in excess of four years. Finally, my inspection of the RHU at Graterford convinced me that the capital inmates have ample space to move about. The space available to each inmate is more than adequate. Accordingly, while square footage is a factor to be taken into consideration in assessing the totality of the conditions of confinement, I find that confinement in cells the size of those at Graterford and Huntingdon does not constitute cruel and unusual punishment.

### B. *Heating/Ventilation*

Plaintiffs complain that inadequacies in the heating and ventilation systems at Graterford and Huntingdon create steambath-like conditions, thus causing discomfort and threatening their health. The Commonwealth counters that the temperature at both institutions is seasonally adequate. The Commonwealth further contends that, to the extent there are ventilation deficiencies, they at worst create uncomfortable conditions that are not actionable under the eighth amendment.

There can be no dispute that the inmates have a right to be free from extreme hot and cold temperatures. Adequate ventilation is a fundamental attribute of shelter, but a distinction must be made between ventilation that is necessary to support life or prevent disease, and ventilation sought to improve comfort levels. In this regard, the Supreme Court in *Rhodes* made clear that "the Constitution does not mandate comfortable prisons...." 452 U.S. at 349, 101 S.Ct. at 2400. The Court stressed that prisons housing "persons convicted of serious crimes cannot be free of discomfort." *Id.*

In this case, RHU inmates from both Graterford and Huntingdon testified about the temperatures in the RHU. Neil Fer-ber, an inmate formerly confined at Graterford, testified that the RHU has absolutely no ventilation. Tr. 6/16/86: 20, 61. He stated that the RHU is hot in the summer and cold in the winter. *Id.* Two inmates, Henry Lee and Michael J. Travaglia, testified about temperatures in the RHU at Huntingdon. In the summer, the two testified that conditions are "humid and damp" and "very warm." Tr. 6/24/86: 14, 58. With regard to winter conditions, Lee and Travaglia described the conditions as "pretty hot" and "very hot." Tr. 6/24/86: 14, 58.

Lieutenant Kenneth Dean Kyler, supervisor of correctional officers at Huntingdon and former supervisor of Huntingdon's RHU, testified that the RHU often becomes warm in the summer, but that correctional officers open the windows upon request to alleviate the heat. Tr. 6/26/86: 114–15.

Lieutenant Kyler noted that inmates in the top tier of the RHU have been offered cells on a lower tier to escape the heat, but have declined the offer. *Id.* at 115. Kyler added that Huntingdon's RHU does not have fans or air conditioning. *Id.* In the winter months, Kyler testified that the temperature averages between 78 and 80 degrees. Tr. 6/26/86: 114.

In addition to temperature, plaintiffs introduced testimony challenging the adequacy of the airflow. The ACA standard on airflow recommends that ten cubic feet of air per inmate circulate into the cell. Tr. 6/18/86: 100. The standard is not mandatory. Tr. 7/30/86: 14–15. Plaintiffs' environmental expert, Curtis Golden, testified that the twofold purpose of this standard is to avoid individuals with respiratory infections from reinfecting themselves and to avoid the transmission of respiratory pathogens to other inmates. Tr. 6/18/86: 100. Golden opined that, absent sufficient airflow, a high probability of respiratory disease exists. *Id.* at 100–01.

Golden measured the airflows in a sampling of cells at both Graterford and Huntingdon. At Huntingdon, he could not detect any airflow in the cells he inspected. Tr. 6/18/86: 100–01. At Graterford, he

similarly could not find any airflow in two cells, but found twenty cubic feet of airflow in two other cells. Tr. 6/18/86: 130-31.

In rebuttal, the Commonwealth offered the testimony of its environmental expert, Harry Steigman, who accompanied Golden on his inspections of Graterford and Huntingdon. For the last three years, Steigman has served as an environmental health consultant to the Commonwealth, and in this capacity, has conducted numerous health inspections at Graterford and Huntingdon. Tr. 7/30/86: 7-8. Consequently, he is very familiar with the physical health of the capital inmates.

Steigman did not refute Golden's airflow findings. However, he did not agree with Golden's conclusions about the probable consequences of his findings. In his role as consultant to the Commonwealth, Steigman has not observed any incidence of the development or spreading of infectious respiratory diseases in the RHU, other than common colds. *Id.* at 10-11. Also, he noted that officials at Huntingdon have taken steps to improve the air circulation in the RHU since Golden's visit. *Id.* at 26-27.

█ The plaintiffs' contentions regarding the airflow and temperature, while legitimate considerations, fall short of stating an eighth amendment violation. I have no doubt that some of the inmates are uncomfortable as a result of the temperature. In *Rhodes*, however, the Court unequivocally stated that the Constitution does not mandate comfortable prisons. The Court went further, stating that "[t]o the extent ... conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347, 101 S.Ct. at 2399. Relying on *Rhodes*, a recent decision in this district rejected an eighth amendment challenge to the lack of central air conditioning and ventilation fans at Graterford. *See Jones v. Zimmerman*, No. 86-4135 (E.D.Pa. Oct. 1, 1986). Numerous other decisions have likewise rejected challenges to a prison's climate absent a showing of extreme temperature variations. *See, e.g., Shelby County Jail Inmates v.*

*Westlake*, 798 F.2d 1085, 1087-88 (7th Cir. 1986); *Loe v. Wilkinson*, 604 F.Supp. 130, 132-33 (M.D.Pa.1984).

The only evidence remotely supportive of unacceptable actionable temperatures is the testimony of the inmates that the RHU is "very hot," but these statements, taken alone, are not sufficient to support a finding of cruel and unusual punishment.

Similarly, I am not persuaded by the plaintiffs' claim regarding the potential health hazards posed by the airflow. Plaintiffs' expert did indeed demonstrate a lack of a significant airflow at Huntingdon, and a similar situation to a lesser extent at Graterford. I am persuaded, however, by the opinion of the state's expert that the airflow situation at both institutions does not pose a genuine health risk. Steigman based his opinion on his familiarity with both institutions, which predates the segregation of capital inmates, whereas plaintiffs' expert visited each institution only once. Also, the Commonwealth's expert relied on the medical records of the RHU inmates, which disclosed no evidence of the health risks urged upon the court by the plaintiffs. Indeed, plaintiffs' expert did not point to any manifestations of the proffered health risks. It is my opinion that the plaintiffs have exaggerated the potential health risks of minimal airflows at the two institutions. For these reasons, I find that the plaintiffs have failed to state an eighth amendment violation on this issue.

### C. *Lighting*

█ Plaintiffs claim that the lighting in the RHU is inadequate, and thus causes eye strain and eye damage. The defendants maintain that the lighting is sufficient.

The ACA standard on lighting recommends twenty footcandles in writing or grooming areas. Tr. 6/18/86: 122. The standard is not mandatory. *Id.* at 149; Tr. 7/30/86: 15. In *Shelby*, the Seventh Circuit recently rejected an eighth amendment challenge to the conditions of confinement in which the plaintiffs averred, *inter alia*, that lighting of less than twenty footcandles is unconstitutional. 798 F.2d at 1088-89. In rejecting this claim, the court noted

that the lighting in the trial judge's courtroom measured only seventeen footcandles. *Id.*

The cells in the RHU at Huntingdon have a fluorescent light in each cell that the inmate controls. Tr. 6/26/86: 113. In addition, the RHU at Huntingdon has four or five 100 watt bulbs in the corridor outside the cells that are kept on constantly, as well as a substantial number of screened windows that provide some natural light. *Id.* At Graterford, inmates in the RHU similarly have lights that can be controlled from within the cell. The corridor outside the cells at Graterford has overhead lighting. The natural light at Graterford is negligible, however, since the windows in the unit are relatively narrow and covered by screens.

Plaintiffs' environmental health expert measured the footcandles in cells at Huntingdon and Graterford. Tr. 6/16/86: 121–23. At Huntingdon, Golden measured approximately eighteen footcandles in the seven or eight cells he tested. *Id.* at 122; Tr. 7/30/86: 13. At Graterford, he measured approximately twenty-six footcandles. Tr. 7/30/86: 13. The experts dispute the worst case measurements: Golden claims he measured only three footcandles in one cell at Huntingdon, while Steigman recalls a worst case of eight footcandles. Tr. 7/30/86: 37–38. Steigman conceded that the lighting in some instances is inadequate. *Id.* at 36. However, he testified that, subsequent to Golden's inspection, Huntingdon officials installed a fluorescent lighting system to correct the lighting deficiencies. *Id.* at 13, 36.

Golden testified that inadequate lighting would cause the capital inmates to experience eye strain and potentially eye damage. Tr. 6/18/86: 122–23. Steigman opined that the only probable consequence of inadequate lighting is eye strain. Tr. 7/30/86: 14.

I find no merit in the plaintiffs' arguments on this issue. The plaintiffs own expert testified that the average footcandle measurement at Graterford exceeds the ACA standard. He also testified that the average footcandle measurement at Huntingdon is only two footcandles below the standard. My two visits to the RHU at Graterford leave me convinced that the lighting is more than adequate. The testimony of plaintiffs' expert about eye damage is not persuasive. There is simply no evidence that the lighting has caused any eye damage. While more light might be preferable, the present conditions hardly amount to a wanton and unnecessary infliction of pain, nor do they transgress contemporary "concepts of dignity, civilized standards, humanity, and decency." *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978) (citations omitted).

### D. *Bedding*

■ The Commonwealth furnishes each cell with a bed. Plaintiffs argue, however, that structural deficiencies in the bedframes force inmates to place their mattresses on the floor, a practice they contend causes "serious back problems." The Commonwealth retorts that the practice of placing mattresses on the floor does not pose a health hazard.

The plaintiffs adduced testimony from both Golden and Gorden C. Kamka, an independent criminal justice consultant and former Secretary of Public Safety and Correctional Service for the State of Maryland, that many inmates place their mattresses on the floor because the mattress would otherwise fall through slats in the bedframe. Tr. 6/18/86: 49–50, 116–18. Plaintiffs corroborated this testimony by introducing photographs of bedframes with widely spaced slats and of cells with mattresses placed on the floor. Ex. P–65 & P–67. Golden testified that all of the mattresses he inspected were dirty. *Id.* at 116.

The applicable ACA standard recommends that correctional officials sterilize used mattresses, pillows, and bedding before they are reissued to another inmate. *Id.* at 116–17. The standard also provides that mattress covers should be cleaned regularly. *Id.* The concern, according to Golden, is the transmission of disease causing organisms.

The Commonwealth's expert acknowledged that some inmates place their mattresses on the floor. Tr. 7/30/86: 23. Steigman commented, however, that inmates continued this practice even after the officials at Huntingdon replaced the slatted bedframes with solid bedframes. *Id.* at 23–24, 27–28. Further, Steigman observed that no adverse health consequences have resulted from the practice of placing mattresses on the floor. *Id.* at 24–25.

In addition to Steigman's testimony, the Commonwealth introduced evidence of its policy regarding the reissuance and cleaning of bedding materials. Ex. D–42. Effective February, 1986, its policy instructs superintendents to issue disinfectant materials to inmates who are moved from one cell to another, which complies with the ACA standard. The policy also precludes the issuance of used bedding that has not been sanitized.

I conclude that the issue of bedding presents no eighth amendment concern. First, the plaintiffs have failed to introduce any evidence of adverse health consequences attributable to the slat type bedframes, the placement of mattresses on the floor, or the sanitation of bedding supplies. Over and above this, the testimony of the plaintiffs' expert belies their contention that the existing bedframes and placement of mattresses on the floor cause "serious back problems." Golden testified only that the beds were "very uncomfortable." He did not document a single incident of serious back problems or the transmission of disease causing organisms. Tr. 6/18/86: 118. Moreover, the evidence leads me to believe that many of the inmates place their mattresses on the floor because the slat type bedframe could be used to store personal items and to better organize the available space. Accordingly, since the Constitution does not mandate comfortable prisons and no injury has been proven, I do not find an eighth amendment violation on this issue.

### E. *Sanitation and Maintenance*

The plaintiffs make several challenges to the general state of repair and level of sanitation at Graterford and Huntingdon. For purposes of clarity, I discuss each of these as subtopics to the broader issue of sanitation and maintenance.

In *DiBuono*, the Third Circuit addressed the significance of the state of repair and level of sanitation in an eighth amendment analysis. 713 F.2d at 1000–01 & n. 30. The court noted that "basic physical amenities, and the consequent effect on sanitation and health, go to the heart of what is meant by 'habitable shelter' for eighth amendment purposes." *Id.* at 1001 n. 30. The Third Circuit declared that "a decaying physical plant allowed by disrepair to become virtually inoperable" always provides an important background element in an eighth amendment analysis. *Id.* The court reasoned, however, that where conditions at an institution have not fallen into disrepair in "basic physical facilities such as heating, ventilation, and showers," no constitutional violation is shown. *Id.*

### 1. *Toilets and Sinks*

Each cell has a standard, institutional sink and commode. Tr. 6/17/86: 12; Tr. 6/18/86: 132. The plaintiffs introduced evidence that some of the toilet fixtures at both institutions are dirty. Ex. P–49 to P–52, P–62 (photographs of Huntingdon); Ex. P–72 & P–73 (photographs of Graterford). Golden testified that approximately one half of the twenty-three toilets and sinks he inspected at Huntingdon were dirty, although he found fewer dirty toilets at Graterford. Tr. 6/18/86: 101–02, 106, 132. Golden also testified that several of the toilets he inspected leaked upon flushing. *Id.* at 101–02. Steigman, the Commonwealth's expert, agreed that some of the toilets at Huntingdon are "chipped and stained." Tr. 7/30/86: 27.

The applicable ACA standard provides that all plumbing fixtures should operate properly and be sanitary. Tr. 6/18/86: 102.

### 2. *Walls and Ceilings*

Some of the cells at Huntingdon are beset by peeling paint and deteriorating plas-

ter wall surfaces. Tr. 6/18/86: 101–03; Ex. P–55 to P–58. The plaintiffs' environmental health expert warned that the peeling paint and falling plaster may cause severe health problems. Tr. 6/18/86: 103. He testified that wall surfaces should be smooth so that they can be readily disinfected. *Id.* at 112–13.

Steigman conceded that some of the cells at Huntingdon need to be repainted. Tr. 7/30/86: 27. He noted, however, that the Commonwealth has undertaken renovations in many of the cells at Huntingdon. *Id.* at 29. Furthermore, he concluded that the deteriorating plaster wall surfaces and peeling paint do not pose a genuine health hazard. *Id.*

### 3. *Cleaning Procedures*

Each inmate is responsible for the cleanliness of his cell. Tr. 6/18/86: 144; Tr. 6/24/86: 100; Tr. 6/26/86: 144; Ex. D–13. The inmates at Graterford receive cleaning materials daily. Tr. 7/30/86: 40–41. At Huntingdon, inmates receive cleaning materials weekly, but can obtain them sooner upon request. *Id.;* Tr. 6/26/86: 144. In order to clean their cells, inmates receive a bucket, scrub brush, disinfectant, and cleaning rags for approximately one half hour. Tr. 6/24/86: 100; Tr. 6/26/86: 144; Ex. D–13. The institution bears the ultimate responsibility for maintaining a minimal level of cleanliness. Tr. 7/30/86: 25.

The applicable, nonmandatory ACA standard recommends that cells should be cleaned daily. Tr. 6/18/86: 103.

### 4. *Inspection Procedures*

To ensure a certain level of maintenance and sanitation, authorities at both institutions adhere to a comprehensive inspection routine. The Commonwealth conducts sanitation, health, and safety inspections weekly. *See* Ex. D–41 (Consolidated Inspection Policy for Sanitation, Hygiene, Fire Prevention, and Safety Inspections). The Commonwealth also maintains inspection policies for housing areas, work areas, and food service facilities. Ex. D–25 to D–27.

█ The maintenance and sanitation issues raised by plaintiffs give me some

pause, but on balance, fall short of stating an eighth amendment violation. Regarding the sink and toilet fixtures, it is obvious that many are dirty, some are filthy. To a large extent, however, many of these conditions exist not because correctional officials have neglected them, but because the inmates refuse to cooperate in routine maintenance and housekeeping. The Extraordinary Occurrence Reports document at least twenty separate incidents where capital inmates refused to follow safety or sanitary regulations. Ex. D–53. Nevertheless, when a toilet is as dirty as some of those in this case, or when it requires repairs, the Commonwealth bears the ultimate responsibility for cleanliness, and must take affirmative steps to remedy the situation.

Although some of the toilets are not as clean as I would think is desirable, all of the toilets appear functional and generally in a state of good repair. The plaintiffs' photographic evidence, while disturbing examples of shortcomings, are misleading to the extent they suggest the entire RHU is similar to an unattended lavatory. The inmates have ample access to cleaning materials, and indeed many inmates clean their cells assiduously. Moreover, my visits to the RHU at Graterford indicate that any problems with the toilet or sink facilities are isolated. Though these facilities could be better, requiring capital inmates to use the existing toilet and sink facilities does not inflict cruel and unusual punishment.

Likewise, the condition of the plaster walls at Huntingdon does not transgress the eighth amendment, although here too prompt repairs in some cells would appear to be warranted. At Graterford, I observed no evidence of peeling paint or cracking plaster. At Huntingdon, however, the plaintiffs' evidence persuades me that the plaster wall surfaces in some cells are deteriorating. Also, some of the cells are in dire need of fresh paint. Nevertheless, despite being aesthetically unpleasant, plaintiffs have not shown that these conditions threaten the well being of the inmates. In fact, the plaintiffs' contention

that "falling plaster" presents a risk of injury is frivolous.

On the whole, I find that the general state of repair and level of sanitation at both institutions is sufficient to withstand eighth amendment scrutiny. The cells and fixtures therein are functional, the Commonwealth provides necessary cleaning materials, and prison officials maintain an acceptable inspection routine. Despite this, however, both institutions are aging and thus some of the conditions are less than ideal. Indeed, some of the conditions are quite disturbing. It appears that the Commonwealth has become complacent in maintaining certain cells in the RHU.

If I were charged with the responsibility of running these institutions, I would give immediate attention to the cells with seriously soiled toilets and sinks, peeling paint, or deteriorating walls. Even though the existing conditions do not inflict cruel and unusual punishment, they certainly do not reflect credit on the Commonwealth or the RHU residents. Particularly since Huntingdon is an old institution, it is incumbent upon the Commonwealth to implement a more effective program of regular maintenance. Without attention, these conditions could cross the threshold proscribed by the eighth amendment in the foreseeable future. Nevertheless, based on the evidence before me, I have no hesitation in concluding that the RHU's at Graterford and Huntingdon are far from "virtually inoperable" as required by *DiBuono*. Thus, the plaintiffs' challenge to the state of repair and the level of sanitation falls short on these facts. Sanitation and maintenance, however, are issues that must be considered in assessing the totality of the conditions of confinement.

### F. *Noise Level in the RHU*

■ Plaintiffs aver that the noise level in the RHU deprives them of their psychological privacy.

Several factors account for the noise level in the RHU. Televisions and radios constitute a primary source of noise. Tr. 6/16/86: 19–20; Tr. 7/28/86: 129–30. Prison policy requires the use of earplugs with radios and televisions, however, correctional officials enforce the policy on a discretionary basis. Tr. 6/16/86: 46, 52–53; Tr. 6/17/86: 14; Tr. 6/26/86: 133; Tr. 7/28/86: 130. Correctional officers enforce the policy more strictly at Huntingdon than at Graterford. Tr. 6/17/86: 14–15, 66; Tr. 6/26/86: 133; Tr. 7/28/86: 130. Lieutenant Flannigan testified that the guards at Graterford do not strictly enforce the earplug policy because most inmates find the earplugs uncomfortable and prefer not to use them. Tr. 7/28/86: 130.

The fact that inmates communicate with one another by talking between cells also contributes to the noise level. Tr. 6/17/86: 14; Tr. 6/24/86: 57–58; Tr. 6/26/86: 154–55; Tr. 7/28/86: 129–30. Some inmates play chess with one another in this manner. Tr. 6/27/86: 98. Finally, the fact that the Commonwealth confines mentally disturbed in the RHU at Huntingdon creates a third source of noise. Tr. 6/24/86: 14–15, 36, 58, 109. Corrections officers, however, ordinarily locate noisy inmates in remote cells. Tr. 6/26/86: 134–35. Moreover, the new medical facility to be constructed at Huntingdon will house many of these mentally disturbed inmates. Tr. 7/29/86: 16–17.

Plaintiffs' expert, Dr. Richard Lonsdorf, described the noise level in the RHU as a "constant din." Tr. 6/17/86: 14. Lieutenant Kyler testified that the noise level is cyclical, depending upon the degree of activity in the RHU, such as visits, new arrivals, showers, meals, or inmate releases. Tr. 6/26/86: 132–33. He testified that the RHU typically quiets down after the 9:00 p.m. inmate count. *Id.* Dr. Canals testified that the RHU is the quietest part of Graterford. Lieutenant Flannigan testified that whenever an inmate makes too much noise, a guard usually attempts to resolve the situation by talking with the offender. Tr. 7/28/86: 129–30. Still, when necessary, prison officials take disciplinary action against inmates who persist in conducting themselves at unacceptably loud levels. *See* Ex. D–6 & D–7 (Adjustment Records for inmates Robert Atkins and Joseph Szuchon).

Although conceding my presence in the RHU no doubt contributed to a reduced level of noise, nevertheless, I am not persuaded that the noise in the RHU is intolerable. While noise may irritate many of the capital inmates, a certain level of noise is inherent in institutional confinement. The situation cannot fairly be said to inflict cruel and unusual punishment within the meaning of the eighth amendment. Accordingly, I will consider the noise level in assessing the totality of the conditions of confinement, but do not find that the noise level alone can be translated into an eighth amendment violation.

## V. *Daily Routine And Privileges*

In addition to the physical plant, a second and primary element of plaintiffs' eighth amendment claim concerns the privileges afforded capital inmates. I have divided my analysis of capital inmate privileges into out-of-cell and in-cell categories. I discuss not only the routines and privileges challenged by the plaintiffs, but also discuss briefly unchallenged privileges, such as in-cell accommodations, mail, and commissary privileges, to provide a complete insight into the totality of the conditions of confinement.

### A. *Out-of-Cell Privileges*

The heart of plaintiffs' challenge to the conditions of confinement centers on the amount of time capital inmates are forced to pass in their cells, which the plaintiffs characterize as "enforced idleness." Plaintiffs argue that capital inmates spend the vast majority of their time without meaningful stimulation. They demand that inmates under sentence of death who are institutionally well-adjusted be permitted more out-of-cell time and group recreational privileges.

The Commonwealth insists that it presently provides a sufficient level of out-of-cell activity. Moreover, the Commonwealth argues that the security concerns attendant to out-of-cell activity justify the existing restrictions.

### 1. *Exercise Privileges*

With regard to exercise, the plaintiffs object to the conditions under which they exercise, the lack of indoor exercise facilities, and the ban on group exercise. The present policy permits capital inmates to exercise outdoors for two hours a day, seven days a week. Tr. 6/16/86: 17–18; Tr. 6/27/86: 17; Tr. 7/28/86: 111–12. The applicable ACA standard recommends one hour a day. Tr. 6/18/86: 53; Tr. 7/29/86: 94.

At both institutions, capital inmates exercise in individual exercise areas that are enclosed by a chain link fence topped with barbed wire. Tr. 6/16/86: 21; Tr. 7/28/86: 132; Ex. P–69 & P–70 (photographs of exercise areas at Huntingdon); Ex. P–77 & P–78 (photographs of exercise areas at Graterford). At Graterford, the exercise areas measure twenty by fifty feet. Tr. 7/28/86: 132. One larger exercise area measures seventy-five by one hundred feet. *Id.* At Huntingdon, the exercise cells are smaller, measuring nine by twenty feet. Tr. 6/17/86: 13, 15–16; Tr. 6/18/86: 52, 125, 139. The exercise areas adjoin one another, so inmates are able to converse during the exercise period. Tr. 6/17/86: 17, 60; Tr. 6/23/86: 47; Tr. 7/28/86: 132.

Capital inmates are permitted to take handballs, playing cards, or a bible into the exercise area. Tr. 6/26/86: 127. The exercise areas at Graterford also have newly installed game tables at which two inmates can visit or play chess. Tr. 7/28/86: 136. Authorities do not permit any other recreational equipment, such as weights, into the exercise areas. Tr. 6/217/86: 154; Tr. 6/18/86: 126, 139; Tr. 6/26/86: 152; Tr. 7/28/86: 141. Neither lavatory nor drinking fountain facilities are available in the exercise areas, although correctional officers provide a pitcher of drinking water in the summer months. Tr. 6/16/86: 22; Tr. 6/17/86: 154; Tr. 6/24/86: 59.

At both institutions, inclement weather cancels the exercise period. Tr. 6/16/86: 18, 23; Tr. 6/18/86: 53, 153. If the weather permits outdoor exercise, the inmates must remain outside for the entire two hour exercise period so that correctional

officers need not continually shuttle inmates to their cells. Tr. 6/16/86: 22–23; Tr. 6/24/86: 62; Tr. 6/26/86: 149. In the winter months, the Commonwealth provides overcoats. Tr. 6/16/86: 65.

The exercise area is adjacent to the RHU at both institutions. Nevertheless, escorting capital inmates to the exercise yard requires significant manpower. The procedure for escorting capital inmates to the exercise area differs slightly at the two institutions. At Huntingdon, two guards let the inmate out of his cell, who proceeds by himself but within the sight of the guards to the ground level. Tr. 6/26/86: 124–25. A contingent of four officers awaits the inmate at ground level, where he is pat searched. *Id.* Once past the search point, the inmate walks directly to his exercise area, where two correctional officers then secure the inmate in his designated exercise area. *Id.* At Graterford, three correctional officers go directly to the inmate's cell, where he is strip searched, and then escorted to the exercise area. Tr. 7/28/86: 132.

■ I do not find that the Commonwealth's exercise regimen, which permits capital inmates to exercise individually or in pairs, two hours a day, seven days a week, violates the eighth amendment. *See Caldwell v. Miller*, 790 F.2d 589 (7th Cir. 1986); *Loe v. Wilkinson*, 604 F.Supp. 130 (M.D.Pa.1984). Plaintiffs have failed to establish that the amount of outdoor exercise or the conditions under which they exercise, namely in individual exercise cells, injures them. To the contrary, the evidence shows that most of the capital inmates enjoy good health. Furthermore, the time allotted for outdoor exercise exceeds the ACA standard of one hour per day and comports with the normal range of outdoor exercise afforded capital inmates in other jurisdictions.[3] Tr. 6/18/86: 64–65. David DiGuglielmo, Director of Treatment at Graterford, testified that even though allowing more exercise time might not create an additional security risk in some

cases, it certainly would in others. Tr. 6/27/86: 120–21. Thus, since there is a correlation between the Commonwealth's policies and institutional security, the existing policy is not "totally without penological justification."

■ Plaintiffs also take issue with the lack of indoor exercise facilities. Neither institution has indoor exercise facilities. Tr. 6/18/86: 124, 138; Tr. 6/24/86: 62; Tr. 7/28/86: 138; Tr. 7/29/86: 14, 18. The new RHU's at Graterford and Pittsburgh, however, will have rooms available for indoor exercise. Tr. 7/29/86: 14, 18. The applicable ACA standards recommend that indoor space for out-of-cell activity be available five days per week. Tr. 6/18/86: 124. The standard is not mandatory. Tr. 7/30/86: 20–21.

I do not find a constitutional problem on the issue of indoor recreational facilities. Plaintiffs have not shown that protracted periods of inclement weather, which would foreclose outdoor activity altogether, occur with any frequency. Moreover, while indoor exercise facilities might be desirable, they are not mandated by the Constitution.

■ The final issue concerns group exercise, which the Commonwealth prohibits for capital inmates. Tr. 6/26/86: 126–27. Capital cases used to be exercised in groups, but in 1984 the Commonwealth eliminated that practice and constructed individual exercise areas. Tr. 6/24/86: 61; Tr. 6/26/86: 150; Tr. 6/27/86: 27–28; Tr. 7/28/86: 112. In the spring of 1986, the Commonwealth modified its policy to permit capital inmates to exercise in groups of two. Tr. 6/17/86: 20; Tr. 6/23/86: 19; Tr. 6/24/86: 61; Tr. 7/28/86: 112. Under this modified policy, the inmates decide who they will exercise with, provided the inmates are compatible. Tr. 6/26/86: 153; Tr. 7/28/86: 138.

Plaintiffs nevertheless object to the modified policy, and demand that the Commonwealth reinstate the policy of complete group exercise. Plaintiffs note that the

---

**3.** Outdoor exercise practices vary among states that have the death penalty, ranging from a minimum of three hours per week to a maximum of eight hours per day. Tr. 6/18/86: 64–65. Capital cases nationwide average three hours of outdoor exercise per day. *Id.*

former policy existed without any incidents of hostage taking or escape attempts. Tr. 6/26/86: 150–51; Tr. 6/27/86: 27–28. Plaintiffs also argue that the individual exercise areas, which they refer to as "dog kennels," are an affront to the personal dignity of the inmates. Tr. 6/17/86: 19–20, 154; Tr. 7/28/86: 136. Dr. Richard G. Lonsdorf, an expert in the field of psychiatry, confirmed that capital inmates have a critical need for meaningful physical activity, which plaintiffs argue is discouraged by the individual exercise yards. Tr. 6/17/86: 19, 22–24. Further, plaintiffs established that individual exercise areas such as those at issue here are no longer in use in any other jurisdiction. Tr. 6/17/86: 159.

The Commonwealth countered that, with few exceptions, the capital inmates enjoy good health. Tr. 7/28/86: 93. The Commonwealth introduced additional testimony that the existing exercise areas permit meaningful exercise in the form of calisthenics and limited jogging. Tr. 6/16/86: 64; Tr. 6/17/86: 60; Tr. 6/23/86: 19; Tr. 6/24/86: 59; Tr. 7/28/86: 133.

The Commonwealth supported its exercise policies by demonstrating the legitimate security reasons underlying those policies. The Commonwealth established that group exercise would enable capital inmates to plan concerted actions, attempt escapes, or take hostages. Tr. 6/26/86: 127–28; Tr. 6/27/86: 12. George Petsock, an expert in corrections and Superintendent at Pittsburgh testified that the Commonwealth's policy emanated from the murder of the Captain of the correctional officers at Pittsburgh, who was bludgeoned to death with a baseball bat by an RHU inmate, albeit a noncapital case. Tr. 7/29/86: 124, 130. *See Commonwealth v. Terry,* 521 A.2d 398 (Pa.1987). On several occasions, capital inmates have made appointments to fight and have fought one another when permitted to play handball in the same exercise area. Tr. 6/26/86: 23; Tr. 7/28/86: 135, 139. One inmate attempted to smuggle a leg he had broken from his desk into the exercise yard. Tr. 6/27/86: 38. Also, Commissioner Jeffes

testified that, on one occasion, the capital inmates at Graterford refused to leave the exercise area and return to their cells. Tr. 7/29/86: 21–22. He opined that had the inmates not been exercised individually, significant manpower and the use of force would have been required to defuse the situation. *Id.* Similarly, Lieutenant Kyler, former supervisor of RHU correctional officers at Huntingdon, Thomas A. Fulcomer, an expert in corrections and Superintendent at Huntingdon, Charles H. Zimmerman, an expert in corrections and Superintendent at Graterford, and Lieutenant Donald W. Flannigan, Chief Supervisor at Graterford, all testified that the group exercise of capital inmates would increase the security risks substantially. Tr. 6/26/86: 127–29; Tr. 6/27/86: 12; Tr. 7/28/86: 112–14, 134–35.

In light of these facts, I hold that the Commonwealth's policy prohibiting group exercise does not contravene constitutional norms. Even accepting that the prior group exercise of capital inmates did not result in any serious security infractions, it is certainly reasonable for Pennsylvania's correctional officials to conclude that group exercise confers upon capital inmates a heightened ability to breach security. I see no evidence to suggest that the inmates are physically harmed by this policy. Nor am I persuaded that the psychological harm, if any, is sufficient to override the Commonwealth's legitimate security concerns. Under *Bell v. Wolfish,* prison administrators must be afforded wide-ranging deference in adopting and executing policies that in their judgment are necessary to preserve order, discipline, and security. 441 U.S. at 547, 99 S.Ct. at 1878. Accordingly, the evidence and applicable law compel me to defer to the Commonwealth's policy banning group exercise.

2. *Ban on Communal Religious Activities*

■ As a part of their challenge to the conditions of confinement, plaintiffs object to the practice of prohibiting communal religious worship.[4] The Commonwealth

---

4. The issues of communal religious worship and access to courts enter this case in two ways.

claims that, as with exercise, the security concerns implicated by group activity justify its prohibition of communal religious worship.

Many capital individuals under a sentence of death turn to religion. Tr. 6/17/86: 24–26; Tr. 6/24/86: 71, 98; Tr. 6/27/86: 78, 80, 87; Tr. 7/28/86: 71, 78. Although communal worship is prohibited, a chaplain visits capital inmates at Graterford and Huntingdon on a daily basis. Tr. 6/23/86: 43; Tr. 6/26/86: 65; Tr. 6/26/86: 117; Ex. D–18. Chaplains are permitted to distribute religious materials and to provide the basic sacraments, communion, and other religious needs. Tr. 6/16/86: 41; Tr. 6/23/86: 19, 44; Ex. D–18. Capital inmates may also visit with outside spiritual advisors without diminishing their weekly visitation privileges. Tr. 6/26/86: 53–54; Ex. D–18.

Visits by the prison chaplains take place at the cell door. As a result, several inmates complained of a lack of privacy during chaplain visits. Tr. 6/16/86: 26; Tr. 6/23/86: 44, 55. The new RHU at Graterford will have rooms available that could be used for private discussions. Tr. 7/29/86: 33.

Although the ban on communal religious worship and diminished privacy during religious visits are proper considerations in an eighth amendment challenge to the conditions of confinement, I find that the facts presented here, taken alone, do not constitute an eighth amendment violation. As noted in my discussion of plaintiffs' challenge to the ban on group exercise, the Commonwealth put forth substantial testimony regarding the security risks presented by group exercise. These same concerns apply here. *See* Tr. 6/27/86: 11; Tr. 7/28/86: 114–115. Moreover, William D. Leeke, an expert in corrections and Commissioner of the South Carolina Department of Corrections, testified that communal religious services involve a "calculated risk." Tr. 7/29/86: 96–98. He opined that the ban on communal religious activities at Graterford and Huntingdon accords with acceptable correctional practice. *Id.* at 104. Since the Commonwealth allows capital inmates to possess religious materials, permits regular visits by chaplains and specially arranged visits by outside clergy, and has articulated compelling security risks that are implicated by communal religious activity, I cannot find that the decision of the prison authorities to disallow communal religious activities inflicts cruel and unusual punishment. Nevertheless, I will consider the ban on communal religious activity in assessing the totality of the circumstances under the eighth amendment and in assessing plaintiffs' first amendment claim.

### 3. *Visitation Privileges*

█ The plaintiffs oppose the ban on contact visits on the grounds that it is psychologically harmful to the inmates and leads to increased tension. Dr. Richard G. Lonsdorf, plaintiffs' expert in psychiatry, testified that the ban on contact visits contributes to depression and psychological dysfunction among the capital inmates. Tr. 6/17/86: 28–29. In response, the Commonwealth argues that its visitation policy is reasonable and based upon legitimate security concerns.

In *Block v. Rutherford*, the Supreme Court held that a blanket prohibition on contact visits for pretrial detainees did not contravene the Fourteenth Amendment. 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). In *Block*, the Court observed: "That there is a valid, rational connection between a ban on contact visits and internal security of a detention facility is too obvious to warrant extended discussion." *Id.* at 586, 104 S.Ct. at 3232. Similarly, the

---

First, the plaintiffs challenge these policies on first and sixth amendment grounds. In addition, plaintiffs challenge these policies as a part of their eighth amendment claim. To the extent the free exercise or legal access claims prove meritorious, adequate redress is available to plaintiffs on independent constitutional grounds. Thus, for purposes of the eighth amendment analysis, I consider the impact of the ban on communal religious activity and the policies affecting access to courts "under the assumption that they do not fall below constitutional standards." *See Caldwell v. Miller,* 790 F.2d 589, 601 n. 16 (7th Cir.1986). Plaintiffs' first amendment claim is discussed in Section VIII of this opinion.

internal security of a correctional institution is rationally connected to a ban on contact visits. Indeed, the weight of authority concludes that a ban on contact visits for convicted prisoners does not run afoul of the eighth amendment. *See Evans v. Johnson*, 808 F.2d 1427 (11th Cir. 1987); *Toussaint v. McCarthy*, 801 F.2d 1080, 1113–14 (9th Cir.1986); Annot., 82 L.Ed.2d 1006, 1024–31 (1986). The Commonwealth implemented its policy prohibiting contact visits for capital inmates in August, 1984. Tr. 6/17/86: 54; Tr. 6/23/86: 30–31; Tr. 6/26/86: 21; Tr. 7/28/86: 137; Ex. D–33.

At Graterford, the Commonwealth permits capital inmates one visit per week. Tr. 6/16/86: 43; Tr. 6/17/86: 55; Tr. 6/23/86: 48; Tr. 6/27/86: 96; Ex. D–32 & D–33, D–36. Authorities limit the number of visitors to four persons per visit. Ex. D–33. Anyone may visit a capital inmate, including minors escorted by a guardian, provided the inmate places the visitor's name on the visitation list. Tr. 7/28/86: 106–07; Ex. D–36. Graterford accepts visitors Monday through Friday, 9:00 a.m. to 3:30 p.m.; weekend and holiday visits are not permitted. Ex. D–33. The state limits visits at Graterford to one hour, but extensions are granted whenever possible. Tr. 6/18/86: 22; Tr. 6/26/86: 138–39; Tr. 6/27/86: 96; Tr. 7/28/86: 137.

Similarly, the Commonwealth allows one visit per week at Huntingdon. Tr. 6/24/86: 29–30; Tr. 6/26/86: 21; Ex. D–15. The correctional officials at Huntingdon allow five visitors per visit. Ex. D–15. Like those at Graterford, the capital inmates at Huntingdon may be visited by anyone named on the visitation list. *Id.*; Tr. 6/24/86: 67. Visits are allowed Monday through Friday, 9:00 a.m. to 4:30 p.m.; weekend and major holiday visits are prohibited. Tr. 6/26/86: 22; Tr. 6/27/86: 14–15; Ex. D–15. Of the thirty-eight requests made by capital inmates at Huntingdon for weekend visitation privileges from December 8, 1984 to June 7, 1986, the Commonwealth denied only one. Tr. 6/27/86: 16. At both institutions, visits with outside religious advisors and attorneys do not count against an inmate's visitation privileges. Tr. 6/26/86: 53–54; Tr. 6/27/86: 97.

Prior to the visit, inmates are strip searched, given clean prison attire, handcuffed, and escorted to the visiting area. Tr. 6/26/86: 119–20; Ex. D–34 & D–35. The guard then locks the inmate into his section of the visiting area. *Id.* A screen and glass divider separates the inmate from his visitors. Tr. 6/26/86: 21. The guard remains in the visiting area to supervise the visit. Tr. 6/16/86: 66; Tr. 6/26/86: 24; Tr. 6/26/86: 119–20; Ex. D–33 to D–35. One inmate complained that the practice of having a guard remain in the visiting area destroys the privacy of the visits. Tr. 6/16/86: 67–68.

I am not persuaded that the policy prohibiting contact visits is a significant factor contributing to the depression of capital inmates. However, even if the Commonwealth's policy contributes significantly to depression among capital inmates, the security concerns of the Commonwealth outweigh the concerns voiced by plaintiffs. The Commonwealth introduced uncontradicted testimony that contact visits enhance considerably the likelihood of contraband entering the institution. Tr. 6/81/86: 60; Tr. 6/27/86: 11; Tr. 7/28/86: 105, 137; Tr. 7/29/86: 88–89. The policy prohibiting contact visits also deters misconduct. *See* Misconduct Report dated 12/22/82 (indicating Otis Peterson engaged in sexual activity during contact visit). In light of the facts, applicable case law, and security concerns underlying the ban on contact visits, I find that the Commonwealth's policy is beyond constitutional reproach.

### 4. *Shower Privileges*

█ The shower privileges and conditions resulting from the showering of the inmates are another element of the plaintiffs' eighth amendment claim. Plaintiffs argue that they are showered too infrequently, and that the steam from the showers at Graterford create steambath-like conditions in the cellblock due to a lack of ventilation. All of the inmates at Graterford have a complained about the condi-

tions created by the showering of inmates. Tr. 6/24/86: 3.

Capital cases at Graterford are showered individually on alternate days. Tr. 6/16/86: 23; Tr. 6/17/86: 59; Tr. 6/23/86: 48; Tr. 7/28/86: 133–34. Capital cases at Huntingdon are showered three times a week. Tr. 6/17/86: 13; Tr. 6/26/86: 120. At Huntingdon, eight RHU inmates shower simultaneously, three or four of whom are capital inmates. Tr. 6/26/86: 122. The showers last between four and five minutes. *Id.* At both institutions, three correctional officers are required to escort the inmates to the showers. *Id.;* Tr. 7/28/86: 115, 133. The new RHU at Graterford will allow inmates to go directly to the showers without an escort. Tr. 7/29/86: 15–16.

The Commonwealth's environmental expert acknowledged that the showers at Graterford have a ventilation problem. Tr. 7/30/86: 39–40. According to the plaintiffs' expert, a lack of ventilation promotes the growth of mold and accelerates the deterioration of plaster walls. Tr. 6/18/86: 134–35. Plaintiffs' evidence, as well as my inspection, indicates that there are indeed lime deposits in the showers. Tr. 6/18/86: 134; Tr. 7/30/86: 21; Ex. P–74 & P–75 (photograph of shower at Huntingdon); Ex. P–76 (photograph of shower at Graterford). My last inspection of Graterford, however, which succeeded the inspections of both experts, revealed that a fan had been installed at Graterford to ventilate the shower area.

I am satisfied that the inmates are showered frequently enough. Also, while the mold and lime deposits are unpleasant, and should be rectified, they do not seriously threaten the health of the capital inmates. Given the added ventilation and the fact that these conditions pose no real health hazard, I find no eighth amendment violation.

### 5. *Telephone Privileges*

At Huntingdon, telephone privileges are an out-of-cell activity because inmates must be taken from their cells to the calling area in order to place a call. Tr. 7/29/86: 23–24. At Graterford, inmates place calls directly from their cells. *Id.* Gordon C. Kamka, plaintiffs' criminal justice expert, testified that the restrictions on telephone privileges lead to increased tension. Tr. 6/17/86: 157–58.

Because of the limitations on the accessibility of telephones, capital inmates at Huntingdon are permitted only one call per month. Tr. 6/17/86: 61; Tr. 6/24/86: 30, 89; Tr. 6/26/86: 21, 143; Ex. D–13 & D–18. At Graterford, phones can be connected outside each cell, so that an inmate need not leave his cell to use the phone. For this reason, capital inmates at Graterford are permitted one call per week. Tr. 6/17/86: 61; Tr. 6/18/86: 23; Tr. 6/27/86: 96; Tr. 7/28/86: 108; Ex. D–37. Neither calls to an attorney nor calls that are not completed count against an inmate's allotment. Tr. 6/17/86: 54, 62; Tr. 6/18/86: 23; Tr. 6/26/86: 21; Tr. 7/28/86: 108; Ex. D–37. Calls may be placed at any time of day, but are limited to 15 minutes. Ex. D–37. In order to place a call, an inmate must make a request and provide a phone number to the officer in charge of the RHU. Ex. D–18; Ex. D–37. Emergency calls are handled on a case by case basis, but authorities at both institutions liberally grant additional phone privileges. Tr. 6/23/86: 4; Tr. 6/26/86: 143–44; Tr. 6/27/86: 96; Tr. 7/28/86: 108; Ex. D–18.

### 6. *Work Assignments*

At present, the Commonwealth does not permit capital inmates to participate in out-of-cell work programs. Tr. 6/17/86: 148; Tr. 6/24/86: 13, 64–65; Tr. 6/26/86: 43. At Graterford, however, authorities permit capital inmates to periodically perform janitorial tasks in the RHU. Tr. 6/23/86: 22–24. Each inmate is assigned work detail approximately one month out of the year. *Id.* Work detail entails about five hours of out-of-cell time a day. *Id.*

### 7. *Program Review Committee*

Once a month, capital inmates have the option of appearing before the Program Review Committee (PRC). Tr. 6/17/86: 59; Tr. 6/24/86: 19; Tr. 6/26/86: 26; Tr. 6/27/86: 76; Ex. D–18. The PRC consists

of the Deputy Superintendent of Operations, the Deputy Superintendent of Treatment, and the Director of Treatment, or their designees. Tr. 6/26/86: 11–12; Tr. 6/27/86: 74–75. The purpose of the PRC is twofold, namely to handle all appeals of misconducts and to monitor the psychological status of the inmates. Tr. 6/26/86: 12–13; Tr. 6/27/86: 68–69. The PRC also provides a forum for capital inmates to air their grievances and request additional privileges. Typically, the meetings last between ten and thirty minutes. Tr. 6/27/86: 113. Most capital inmates participate in the PRC meetings, but they are not obligated to do so. Tr. 6/27/86: 76. If an inmate does not appear, the PRC nevertheless reviews his case based on information provided by the staff. Ex. D–18.

### 8. Out-of-Cell Privileges in Other Jurisdictions

Plaintiffs introduced evidence of the capital inmate management practices of numerous other jurisdictions. By way of consent decrees and court orders, plaintiffs outline what they contend is a trend toward less restrictions and greater activity for capital inmates.

Gordon Kamka testified that the current trend is toward the "freeing of restrictions." Tr. 6/17/86: 158. Additionally, plaintiffs offered evidence of the management practices in twelve other states. The proffered evidence reflects a diverse range of practices. In Maryland, for example, capital inmates reside within the general prison population. Tr. 6/17/86: 122; Tr. 6/18/86: 55. In Arizona, some capital inmates reside within the general prison population, and all of the capital inmates are permitted contact visits, provided their preceding six months are misconduct-free. Tr. 6/17/86: 160; Tr. 6/18/86: 68. Texas allows capital inmates sixteen hours of out-of-cell time each day, as well as jobs and educational programs. Tr. 6/17/86: 159–160; Tr. 7/30/86: 52–53. In California, out-of-cell time is a function of the inmate's behavior. Tr. 6/17/86: 161; Ex. P–7. Georgia allows five hours a day of out-of-cell time, whereas Missouri allows sixteen hours of indoor or outdoor recreation per week and Nebraska allows approximately twenty hours of out-of-cell time each week. Tr. 6/17/86: 160, 163; Ex. P–6, P–8 & P–83. South Carolina permits group exercise, but only one hour a day. Tr. 7/29/86: 81–91. Plaintiffs also introduced evidence concerning the practices in Virginia, Tennessee, and New York. Tr. 6/18/86: 54.

The Commonwealth concedes that some jurisdictions employ more liberal capital inmate management practices. The Commonwealth asserts, however, that considerations unique to each state, such as the physical plant, the size of the correctional staff, and the political climate, necessitate different practices. Both Commissioner Jeffes and Commissioner Leeke testified that each state faces unique concerns. Tr. 7/29/86: 47, 95–96. Jeffes opined that Pennsylvania's practices accord generally with those of other states. *Id.* at 28–29. Moreover, he intimated that the plaintiffs' evidence of a "trend" toward out-of-cell time is misleading because the majority of the practices cited by plaintiffs are the result of consent decrees, and thus the "trend" is established by the courts and not the changing attitudes of prison administrators and penologists. *Id.* at 52–53.

### B. In-Cell Privileges

### 1. Mail Privileges

■ Inmates have free access to the postal system. The Commonwealth provides free postage for ten letters a month, and capital inmates receive mail and periodicals regularly. Tr. 6/16/86: 54–55; Tr. 6/23/86: 46; Tr. 6/26/86: 86. Moreover, the inmates did not report any significant difficulties in communicating by mail with their attorneys. Tr. 6/16/86: 54; Tr. 6/23/86: 41. The Constitution does not confer upon the inmates an absolute right to unlimited free postage. Hence, the Commonwealth's ten free-letter limit satisfies constitutional minima. *See Jones v. Wadsworth*, No. 86–6428 (E.D.Pa. Nov. 24, 1986).

### 2. Educational Programs

■ Plaintiffs object to the lack of organized educational programs. The eighth

amendment, however, does not require that prison officials provide educational programs. Nonetheless, members of the plaintiff class have access to the same educational opportunities as inmates in the general population. Tr. 7/29/86: 22–23. Thus, in-cell educational programs are available upon request. Ex. D–18 & D–45. The courses are provided free of charge; offerings range from basic literacy through a GED program. Tr. 6/16/86: 40; Tr. 6/17/86: 63, 148; Tr. 6/24/86: 24, 99; Tr. 6/27/86: 97; Tr. 7/28/86: 109; Ex. D–18 & D–45. Further, the Commonwealth offers post-secondary courses to those who are interested and able to afford them. Tr. 7/29/86: 22–23; Ex. D–45.

### 3. *In-Cell Accommodations*

■ As mentioned above, all cells are equipped with a bed and a combination toilet and sink fixture, which provides hot and cold running water. The Commonwealth intends to install desks in all of the cells at Huntingdon, some of which have already been installed. Tr. 6/27/86: 18–19; Tr. 7/30/86: 28. The Commonwealth provides blankets, a jumpsuit, and two sets of underwear, plus inmates may purchase extra clothing. Tr. 6/16/86: 61; Tr. 6/26/86: 20. Additionally, the Commonwealth allows inmates to have radios, televisions, a reasonable number of books without metal bindings, newspapers, playing cards, pens, paper, and painting kits in their cells. Tr. 6/17/86: 64–66; Tr. 6/18/86: 51–52; Tr. 6/23/86: 19, 46, 53; Tr. 6/24/86: 8, 28; Tr. 6/26/86: 18–20; Tr. 6/27/86: 16–17; 7/28/86: 109; Ex. D–17, D–18, D–19 & D–49. The plaintiffs' principal complaint in regard to in-cell accoutrements is the absence of a locker in which to store personal items. Despite this, however, I find that the in-cell accomodations are constitutionally adequate. Tr. 6/18/86: 116, 132.

### 4. *Commissary Privileges*

Although capital inmates may not visit the prison commissary directly, they are permitted to purchase almost all of the items available to inmates in the general population. Tr. 6/16/86: 19–20, 42; Tr. 6/26/86: 23; Tr. 6/27/86: 97. Some items may not be purchased for security reasons, such as razor blades, batteries, and other metal containing objects. Each inmate receives an extensive inventory and price list, from which orders may be placed. Ex. D–21 to D–23 & D–39. The commissary typically delivers orders within one week. Tr. 6/16/86: 42.

## VI. *Support Services*

### A. *Psychiatric and Counseling Services*

Plaintiffs place great emphasis on their challenge to the adequacy of the psychiatric and counseling services. They maintain that these services, though improved, are inadequate because the environment in which psychological and psychiatric evaluations take place does not afford sufficient privacy. Thus, according to plaintiffs, the Commonwealth's mental health care staff are unable to diagnose the extent of the psychological damage being inflicted on class members.

Under the eighth amendment, plaintiffs must prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). In *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir.1979), the Third Circuit wrote that "[t]he key factor in determining whether a system for psychological or psychiatric care in a jail or prison is constitutionally adequate is whether inmates with serious mental or emotional illnesses or disturbances are provided reasonable access to medical personnel qualified to diagnose and treat such illnesses or disturbances." The court also held that the *Estelle* test is two pronged, requiring both "deliberate indifference" and "serious" medical needs. *Id.* at 762 (citing *West v. Keve*, 571 F.2d 158 (3d Cir.1978)). The court concluded that the *Estelle* test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients. Courts will 'disavow any attempt to second-guess the propriety or adequacy of a particular

course of treatment ... [which] remains a question of sound professional judgment.' " *Id.* (quoting *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977)). Since I find that the capital inmates' collective medical needs are serious, I only consider whether the system of care evinces a deliberate indifference to their medical needs.

Eleven correctional counselors, five psychologists, and two consulting psychiatrists staff the entire correctional institution at Graterford, which houses capital inmates with the most extensive psychiatric histories. Tr. 6/27/86: 65–67, 89. The staff at Huntingdon consists of eleven counselors, three psychologists, a part-time psychiatrist, and eight clerical personnel. Tr. 6/26/86: 3–4.

Psychologists and psychiatrists visit the capital inmates at Graterford and Huntingdon regularly. Capital inmates may request their services at any time. Tr. 6/26/86: 10; Tr. 7/28/86: 57–58. At Graterford, a psychiatrist visits the RHU once a week. Tr. 7/28/86: 57–58, 73, 137. A psychiatrist visits the RHU at Huntingdon three times a week. Tr. 6/26/86: 64, 76. For two of the three visits, Dr. Frederick E. Wawrose, Huntingdon's staff psychiatrist, testified that he briefly passes through the RHU. *Id.* at 76. On the third visit, however, he spends three to four hours in the RHU. *Id.* Dr. Wawrose testified that he not only visits those who have requested to see him or who have been designated by the authorities as inmates requiring attention, but that he also visits inmates who simply ask to see him as he passes by their cell. *Id.* at 64, 77.

Psychiatrists review the status of each capital inmate every sixty days. Tr. 6/26/86: 9, 65. The Commonwealth also assigns a counselor to each capital inmate, who meets with the inmate weekly. Tr. 6/23/86: 28, 83; Tr. 6/24/86: 30; Tr. 6/26/86: 7; Tr. 6/27/86: 67; Ex. D–18. The counselor acts as an intermediary between the inmate and third parties, from family members to prison officials. Tr. 6/26/86: 4, 7. Visits by the counselors average five to ten minutes, but sometimes last as long as forty-five minutes. Tr.

6/24/86: 87; Tr. 6/26/86: 52. Visits typically entail a counselor inquiring about an inmate's health, attending to his requests, assessing the condition of his cell, and evaluating his level of participation in ongoing prison activities. Tr. 6/26/86: 65–67.

The thrust of plaintiffs' complaint comes from their expert, Dr. Richard Lonsdorf, who testified that the combination of the lack of privacy and mistrust skews the diagnosis and evaluation of the psychological health of the death row inmates. Tr. 6/17/86: 43–44. Like chaplains, the counselors, psychologists, and psychiatrists may only visit capital inmates at their cell door, with guards accompanying them for security reasons. Tr. 6/26/86: 23; Tr. 6/27/86: 113–14; Tr. 7/28/86: 59, 60–61, 82. Plaintiffs contend that this practice eliminates all privacy, and thus undermines the value of the mental health care services.

With regard to their interactions with mental health care personnel, the inmates testified uniformly that they repress their innermost feelings. Neil Ferber testified that the combination of a lack of privacy and the injury to his self-esteem that would result in the event other inmates overheard his confidences prevented him from meaningfully interacting with the counseling staff. Tr. 6/16/86: 20, 58, 71. Henry Fahy testified that if he confided his feelings about suicide, the Commonwealth would immediately remove his personal belongings from the cell. Tr. 6/23/86: 65–67. Some inmates do not trust the staff because they are employees of the state. *See* Ex. P–3. Dr. Joaquin Canals, staff psychiatrist at Graterford, confirmed that capital inmates distrust the staff. Tr. 7/28/86: 72–73. Dr. Wawrose agreed, adding that capital inmates generally are not friendly toward the staff and many refuse treatment altogether. Tr. 6/26/86: 65–67, 78.

The Commonwealth counters plaintiffs' challenge to the adequacy of the counseling and psychiatric services by emphasizing that numerous avenues for help are available. The Commonwealth argues that, far from being neglected, the psychological health of the inmates is constantly moni-

tored by correctional counselors, psychologists, psychiatrists, guards, physicians, and the PRC.

■ It is true that most of the inmates facing the death sentence are under stress, anxious, and depressed. Tr. 6/26/86: 71–72; Tr. 7/28/86: 68–70. Significantly, however, neither Dr. Wawrose nor Dr. Canals observed psychological or psychiatric deterioration substantial enough to warrant confinement in a less restrictive environment during their treatment of capital inmates, which predates the confinement of capital inmates in administrative segregation. Tr. 6/26/86: 73; Tr. 7/28/86: 62–64. Rather, both opined that the Commonwealth's monitoring system adequately detects significant deterioration or behavioral adjustment. Tr. 6/26/86: 69–70; Tr. 7/28/86: 65.

The Commonwealth also adduced testimony on the privacy and mistrust issues. Regarding privacy, Dr. Wawrose, Dr. Canals, and inmate Michael J. Travaglia stated that cell visits afford sufficient privacy if one speaks quietly. Tr. 6/24/86: 88; Tr. 6/26/86: 78; Tr. 7/28/86: 66. Moreover, private meetings could be accommodated, but that the inmates rarely request such consultations, and the counseling personnel rarely deem them necessary. Tr. 6/23/86: 64–66, 96–97; Tr. 6/26/86: 67, 88, 117; Tr. 6/27/86: 70, 115–16; Tr. 7/28/86: 61, 75; Tr. 7/29/86: 33. David DiGuglielmo, Director of Treatment at Graterford, testified that, on occasion, psychologists and psychiatrists have conducted interviews in the visiting room and kitchen to maximize privacy. Tr. 6/27/86: 70–73, 115–16.

Regarding the mistrust issue, the Commonwealth's psychiatrists testified that they will disclose confidences even if it engenders mistrust, but only under such circumstances as are necessary and in accord with standard psychiatric practice. Thus, Dr. Wawrose testified that he would disclose confidentially revealed plans to escape, intentions to injure, and possession of contraband, even though revealed to him in confidence. Tr. 6/26/86: 82–84. He would not disclose, however, confidentially revealed sexual or emotional problems. *Id.*

Moreover, even though the Commonwealth's policy of reacting sternly to an inmate ostensibly contemplating suicide may deter inmates from discussing suicidal inclinations, both sides agree that the overriding concern for the welfare of the inmate necessitates this practice. Tr. 6/18/86: 26; Tr. 6/26/86: 80, 84–85; Tr. 7/28/86: 90–92.

Following the standards announced in *Estelle* and *Pierce*, I find that the counseling, psychological, and psychiatric services available to capital inmates far exceed the constitutional threshold. I see no evidence in the record that the Commonwealth has denied the inmates "reasonable access to medical personnel," as required in *Pierce*. To the contrary, the inmates have ample opportunity to take advantage of these services. As for the relationship between the inmates and staff, incarceration inherently entails compromising certain confidences, which inevitably engenders mistrust. But even if this situation is attributable to a policy of the Commonwealth, which I am not convinced it is, the record does not evince the deliberate indifference required by *Estelle* to support an eighth amendment violation. Of course, the system of mental health care is an appropriate consideration in evaluating the totality of the conditions of confinement, but taken alone, it does not infringe plaintiffs' eighth amendment rights.

### B. *Medical Services*

■ The Commonwealth maintains a satisfactory system for medical care as well. At both institutions, a medical doctor visits the RHU daily. Tr. 6/16/86: 39; Tr. 6/23/86: 8; Tr. 7/28/86: 137. In addition, inmates may request an examination by a staff physician at any time. Tr. 6/24/86: 33; Tr. 6/26/86: 25. Upon making such a request, a nurse examines the inmate to determine whether a visit by the physician is necessary. Tr. 6/24/86: 33; Tr. 6/26/86: 25. When necessary, an inmate is treated in his cell or taken to an appropriate location. Tr. 6/23/86: 50; Tr. 6/26/86: 25–26, 118–19. Beyond these medical services, RHU correctional officers

dispense aspirin upon request. Tr. 6/16/86: 63. The record contains ample evidence, including testimony by several inmates, attesting to the adequacy of the medical service. Tr. 6/16/86: 39; Tr. 6/24/86: 32, 85–86.

## C. *Library Services*

Plaintiffs claim that the restrictions on access to the law library contravene their sixth and eighth amendment rights. I address their eighth amendment claim in this section of the opinion, and address their sixth amendment claim in Section IX.[5]

The library staff at Huntingdon consists of a head librarian, a library assistant, and four civilian library aids, three of whom are legal reference aids.[6] At Graterford, the library staff consists of a head librarian and seven library assistants, five of whom are legal reference aids. Tr. 6/27/86: 48.

The Commonwealth does not allow capital inmates direct access to the law libraries. Tr. 6/17/86: 185; Tr. 6/23/86: 10, 17; Tr. 6/24/86: 104; Tr. 6/26/86 94; Tr. 6/27/86: 50. Nor does the Commonwealth permit capital inmates access to paralegals or "jailhouse lawyers." Tr. 6/23/86: 8; Tr. 6/24/86: 104. These policies are designed to preclude contact with others, and are based on security concerns, most notably the security threat to staff and other inmates attendant to escorting capital inmates to the library and monitoring them while they research. Tr. 7/29/86: 25–26; Tr. 7/29/86: 26.

In order to obtain legal reference materials, capital inmates must complete a "request slip." Tr. 6/23/86: 17; Tr. 6/24/86: 20, 108–09; Tr. 6/26/86: 94–95. The Commonwealth provides inmates with an inventory of materials, both legal and nonlegal, that are available from the library. Tr. 6/26/86: 96. From this, inmates request specific cases, reporters by volume, or materials on a general subject matter, such as habeas corpus. Tr. 6/23/86: 36; Tr.

6/24/86: 43–44; Tr. 6/26/86: 94–95; Tr. 6/27/86: 52. The library also makes available a variety of legal forms. Tr. 6/26/86: 97; Tr. 6/27/86: 54–55; Ex. D–14 & D–52. Library employees or RHU officers collect and deliver the request slips to the library, where the head librarian or a legal reference aid completes the request. Tr. 6/26/86: 95–96, 104; Tr. 6/27/86: 61. The library returns unintelligible slips for clarification. Tr. 6/26/86: 96; Tr. 6/27/86: 52.

Either the correctional officers or library personnel deliver the completed requests, usually within a week. Tr. 6/26/86: 95. At Huntingdon, a library assistant delivers completed requests three times a week, typically spending between two and two and one-half hours delivering materials and clarifying requests. *Id.* at 95–96. At Graterford, the head librarian visits the RHU at least once every two weeks, in addition to the routine deliveries by her staff. Tr. 6/16/86: 40, 55; Tr. 6/27/86: 51.

The library at Graterford places no restrictions on the number of books that an inmate may have in his cell at one time. Tr. 6/27/86: 53. At Huntingdon, an inmate may only possess three books at one time. Tr. 6/24/86: 20; Tr. 6/26/86: 95. If possible, the library staff at both institutions prefers to give inmates copies of requested cases, thereby avoiding having a reporter out of circulation. Tr. 6/26/86: 96–97; Tr. 6/27/86: 52. If an inmate is able to pay for the photocopying, he may purchase copies of cases; if not, the library provides copies free of charge, which may be kept for a period of one month. Tr. 6/23/86: 36; Tr. 6/26/86: 95–97; Tr. 6/27/86: 53. When a book does circulate, the inmate may retain it until another inmate requests it. Ex. D–19.

██ Plaintiffs assail the Commonwealth's access policy on the grounds that denying capital inmates direct access to the library and limiting access to the present

---

5. For a discussion of how this challenge will be incorporated into the eighth amendment analysis, see *supra* note 3.

6. Legal reference aides are persons trained to assist inmates in locating legal reference materi-

als. Tr. 6/27/86: 48. However, they are not responsible for, and do not perform, legal research. *Id.* This enables legal reference aides to devote their time exclusively to locating materials.

system, a modified version of what is commonly known as a "paging system,"[7] effectively denies plaintiffs of their ability to perform legal research. Plaintiffs argue that many of the capital inmates devote substantial amounts of time to legal research, and that the modified paging system unduly restricts their ability to do so. Tr. 6/23/86: 19. Otis Peterkin testified that he spends between five and six hours a day on his research. Tr. 6/23/86: 19. Peterkin also testified that the modified paging system is very cumbersome, often yielding irrelevant materials. Tr. 6/23/86: 17. Moreover, he lamented the fact that capital inmates cannot shepardize cases or discuss legal issues with persons knowledgeable in the law. Tr. 6/23/86: 18; Tr. 6/24/86: 21. Both Henry Fahy and Henry Lee testified about their frustrations with the system as well. Tr. 6/23/86: 72–73; Tr. 6/24/86: 21.

Plaintiffs identify Ronald Wheeler as their principal example of an inmate demonstrably harmed by the modified paging system. Wheeler has elected to represent himself in the appeals of his conviction, and is apparently the only capital inmate opting to do so. Tr. 6/24/86: 109–10. The state court appointed counsel for Wheeler on three occasions, but he dismissed all three. Tr. 6/24/86: 112–15. Since Wheeler has rejected all attempts to appoint counsel, the state court appointed consulting counsel. *Id.* That appointment is still in effect, but Wheeler has expressed his dissatisfaction with, and intention not to avail himself of, the services of his consulting counsel. *Id.* at 115.

Wheeler contends that his limited access to the law library at Huntingdon has prevented him from completing an appellate brief due December, 1985, in the Pennsylvania Supreme Court. *Id.* at 107–09. Although he attributes his tardiness to the lack of access to the library, the Commonwealth provided Wheeler, pursuant to court

order, with twenty-eight days, five hours a day, of direct access to the library, during which he prepared a brief to be filed in a federal district court. *Id.* at 124–29. That brief, which consisted of 216 pages, addresses the very issues to be briefed before the Pennsylvania Supreme Court. *Id.* at 128. Nevertheless, Wheeler has yet to file a brief with the Pennsylvania Supreme Court. On this record, then, I cannot accept Wheeler's contention that the Commonwealth's access policy caused his lateness.

The Commonwealth insists that its system affords capital inmates sufficient access to the library. Moreover, the Commonwealth argues that the appointment or availability of counsel for all of capital inmates undercuts the injury that the inmates allegedly suffer as a result of its access policy. The record reflects that all of the capital inmates have appointed counsel, with the exception of Wheeler. Tr. 6/23/86: 34–35, 38–39, 73; Tr. 6/24/86: 93, 109–10; Tr. 11/7/86: 25. *See also* 18 U.S. C.A. §§ 3005, 3006A (West 1985) (Criminal Justice Act provisions on appointment of counsel); Pa.R.Crim.P., Rule 1503, 42 Pa. Cons.Stat.Ann. (Purdon Supp.1986) (Post Conviction Hearing Act), *Guidelines for the Administration of the Criminal Justice Act, vol. VII, Guide to Judiciary Policies and Procedures,* ¶¶ 2.14(B) & 3.16 (March, 1987) (allowing for compensation of state or local public defender organization, legal aid agency, or legal consulting service in death penalty federal habeas corpus case under Criminal Justice Act). The record further reflects that capital inmates were reasonably able to communicate with their attorneys by mail, visits, and telephone calls. Tr. 6/16/86: 54; Tr. 6/23/86: 16; Tr. 6/24/86: 91.

Although consideration of the Commonwealth's access policies in the context of the eighth amendment is somewhat unusual, I am far from convinced that these

---

**7.** A paging system allows a prisoner to request cases or specific volumes. "The significant features of such a system are that the prisoner must know in advance which volumes he will need to review and that the process of ordering and returning books drastically prolongs legal research." *Toussaint v. McCarthy,* 801 F.2d 1080, 1109 n. 30 (9th Cir.1986). I characterize Pennsylvania's approach as a "modified" paging system because it permits requests for materials on a general subject without requiring specific case citations.

policies inflict cruel and unusual punishment. All of the capital inmates either have or have access to counsel. Also, the modified paging system, while perhaps not ideal, cannot be said to inflict cruel and unusual punishment. Of course, I will consider the access policies in assessing the totality of the conditions of confinement. Also, I consider the foregoing findings of fact in relation to the plaintiffs' sixth amendment claims in Section IX of this opinion.

### D. *Food Services*

■ In essence, plaintiffs' complaints about the food service focus mainly on the lack of communal eating privileges and the temperature of the food.

The Commonwealth serves three meals daily, which must be eaten by the inmates in their cells. Tr. 6/26/86: 129–31. At Huntingdon, the meals are prepared in a separate kitchen, then delivered to the cells on thermal trays. Tr. 6/18/86: 136; Tr. 6/24/86: 45; Tr. 6/26/86: 129; Tr. 7/30/86: 26–27. At Graterford, meals are prepared and delivered to a steamtable that is located within the RHU, and then delivered to the cells. It takes approximately three minutes to deliver the food from the steamtable to the furthest cell. Tr. 6/18/86: 158–59; Tr. 7/30/86: 6.

Plaintiffs introduced evidence about various deficiencies in the food service. Inmates Peterkin and Lee testified that the food was too cold. Tr. 6/23/86: 29; Tr. 6/24/86: 12. Lee also testified that the portions are too small. Tr. 6/24/86: 12. Travaglia objected that he did not receive enough time to eat. *Id.* at 86. Nevertheless, the record shows that inmates have between thirty-five and forty-five minutes to eat their meals. Tr. 6/26/86: 131.

Dr. Richard Lonsdorf opined that cold food contributes to the psychological dysfunction of the inmates. Tr. 6/17/86: 32. The temperature of the food as measured by plaintiffs' environmental expert at Graterford, however, fell within acceptable temperature ranges. Tr. 6/18/86: 158. Moreover, the Commonwealth's expert opined that the methods of preparing and delivering food are sufficient to eliminate any real health hazard. Tr. 7/30/86: 17.

The eighth amendment prohibition against cruel and unusual punishment requires that inmates be served "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Plaintiffs have not made any showing that the food is nutritionally inadequate, nor have they demonstrated to my satisfaction that the conditions under which the food is prepared and served present an immediate danger to the health of those confined to the death rows. The Commonwealth, on the other hand, articulated legitimate security reasons for not allowing communal dining and established that it serves nutritious meals. For these reasons, I find that the present system of food service does not transgress the prohibitions of the eighth amendment. However, I will consider the food service as a factor in assessing the totality of the conditions of confinement.

### VII. *Totality Of The Conditions Of Confinement*

#### A. *Injury Attributable to the Conditions of Confinement*

Although the foregoing analysis of the conditions of confinement did not reveal any policies or practices that, standing alone, inflict cruel and unusual punishment, *Rhodes v. Chapman* authorizes a district court to remedy eighth amendment violations that are based on the cumulative effect of the conditions of confinement. 452 U.S. at 362–63 & nn. 10–11, 101 S.Ct. at 2407–08 & nn. 10 & 11 (Brennan, Blackmun & Stevens, JJ., concurring). Plaintiffs aver that the conditions at Graterford and Huntingdon leave capital inmates chronically idle, and largely ignore their emotional well-being. Plaintiffs contend that lethargy, anger, and physiological deterioration result directly from the Commonwealth's management policies.

To substantiate their contentions, plaintiffs offered the testimony of Dr. Richard Lonsdorf, who performed psychological evaluations on eight randomly selected capital inmates, four from each institution. Tr. 6/17/86: 10–11, 48. He found an abnormally high incidence of chronic depression. Lonsdorf observed that confinement in the RHU has caused a loss of the ability to converse, disorientation, and resentment, in extreme cases leading to acute paranoia. *Id.* at 18–19. Gordon Kamka, plaintiffs' independent criminal justice consultant, corroborated Dr. Lonsdorf's findings by his observation that large numbers of inmates sleep at midday, which is a manifestation of depression. Tr. 6/17/86: 149. Moreover, Dr. Lonsdorf testified that human beings have a critical need to interact, and in his opinion the restrictions on meaningful physical activity have contributed to the psychological injuries allegedly suffered by capital inmates. *Id.* at 16, 22–25. He suggested that the phenomenon of persons under sentence of death embracing religion or legal pursuits reinforces his conclusion that conditions on death row have had an adverse psychological impact. *Id.* at 24–26. He further opined that the conditions may cause the more desperate inmates to attempt suicide. *Id.* at 26–27. According to Lonsdorf, more human interaction would mitigate the psychological injuries suffered by capital inmates. *Id.* at 33–34.

There is little dispute, even among the Commonwealth's experts, that many of the capital inmates are psychologically disturbed. Dr. Wawrose testified that the capital inmates are unquestionably under stress, and both he and Dr. Canals concluded that many are depressed. Tr. 6/26/86: 71–72; Tr. 7/28/86: 68–70.

The issue is whether the conditions of confinement or the impending death sentence, or both, cause the psychological problems of the capital inmates. Dr. Lonsdorf holds the opinion that the conditions of confinement, not the impending death sentence, cause the observed psychological dysfunction. Tr. 6/17/86: 75–76. According to him, capital inmates do not dwell on the impending death sentence. Rather, their depression stems from immediate stressor events that occur in their daily lives. *Id.* at 27–28, 32–33, 75–55, 80.

The Commonwealth's experts, on the other hand, believe that the conditions of confinement are only one factor in the equation explaining psychological dysfunction among capital inmates. Dr. Canals testified that the death sentence is a primary factor explaining depression among capital inmates. Tr. 7/28/86: 68–70, 77. Dr. Wawrose opined that two factors, personal problems inherent in any incarceration and the impending death sentence, are the principal causes of the observed anxiety and depression. Tr. 6/26/86: 72. David DiGuglielmo testified that the impending death sentence undoubtedly impacts on the inmate's daily life, observing that it creates numerous immediate stressor events such as media coverage of the death penalty, developments in the inmate's legal appeals, and developments in the cases of other capital inmates. Tr. 6/27/86: 92–93, 100. In fact, DiGuglielmo stated that the restrictive environment of the RHU actually helps unstable inmates by providing a more structured environment. Tr. 6/27/86: 83, 89–91.

Experts for both sides agree that it is virtually impossible to determine precisely to what extent the observed psychological disturbances are due to the conditions of confinement and to what extent they are due to the impending death by execution. Tr. 6/17/86: 32, 78; Tr. 6/27/86: 92–94. Significantly, the Seventh Circuit, in *Bono v. Saxbe*, 620 F.2d 609, 614 (7th Cir.1980) (citations omitted), held that "[i]nactivity, lack of companionship and a low level of intellectual stimulation do not constitute cruel and unusual punishment even if they continue for an indefinite period of time.... Expert testimony that such segregation could cause psychological harm is not determinative."

#### B. *Security Considerations*

In *Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), the Supreme Court observed that "central to all other corrections goals is the institutional consideration of internal security

within the corrections facilities themselves." Institutional security considerations underlie virtually every policy challenged in this lawsuit. The Commonwealth contends that capital inmates pose unique security risks, which in turn necessitate the existing practices and policies. Plaintiffs argue that even though some of the capital inmates may pose serious security risks, others do not, and hence the treatment of capital inmates as a group denies many of privileges to which they are entitled.

There can be no dispute that capital inmates pose unique security concerns because of the nature of the penalty to be exacted. Commissioner Jeffes testified that, because of the death penalty, capital inmates adopt a "nothing to lose" mentality. *Id.* Superintendent Zimmerman agreed that capital inmates have no incentive to comply with institutional rules and regulations. Tr. 7/28/86: 103–30; Tr. 7/29/86: 61.

A second reason capital inmates pose unique security concerns is their tendency to react strongly to unfavorable legal developments. Tr. 6/27/86: 100–02. Director of Treatment DiGuglielmo and Superintendent Zimmerman testified that, beyond intermediate post-conviction developments, the signing of a warrant, which is the final prerequisite to implementing the death penalty, holds the greatest potential for disrupting the capital inmate population.[8] *Id.* at 123–24; Tr. 7/28/86: 122–23. They stated that capital inmates share a common identity, and thus the signing of a warrant seriously affects the entire capital population. Tr. 6/27/86: 123; Tr. 7/28/86: 122–23. When the Governor signed warrants for inmates Michael Travaglia and Keith Zettlemoyer, the climate in the RHU became hostile and the inmates became aggressive. Tr. 6/26/86: 123–24. Indeed, inmate Robert Atkins vowed to kill six guards for each warrant that was signed. *Id.* Since the Commonwealth has no control over the timing of these legal developments, it must constantly be prepared to respond to attitude swings among the inmates.

The record is replete with additional evidence legitimizing concerns about security breaches in the form of hostage taking, self-inflicted harm, harm to other inmates, threats to the correctional staff, escape attempts, and concerted activities. Tr. 6/26/86: 23, 127–29; Tr. 6/27/86: 9–11, 14; Tr. 7/28/86: 135; Tr. 7/29/86: 67–68; Ex. D–44. The Extraordinary Occurrence Reports indicate, for example, that inmate Tyrone Moore repeatedly engaged in disruptive conduct, including throwing food, obstructing the view into his cell, and flooding another inmate's cell. Ex. D–44. Similarly, inmates Bobbie Sims and Barry Gibbs received numerous misconducts for disruptive behavior, and inmate Ronald Logan repeatedly threatened correctional personnel, twice assaulting guards. The Extraordinary Occurrence Reports further document numerous incidents of capital inmates interfering with the orderly running of the institution, refusing to obey orders, possessing contraband, threatening prison employees, fighting, using abusive language, inciting riots, conspiring to escape, transporting deadly weapons, mutilating themselves, and destroying property. Ex. D–53.

Commissioner Jeffes and Superintendent Fulcomer testified that their demonstrated disregard for human life, explosive personalities, and behavioral unpredictability render capital inmates extremely dangerous. Tr. 6/27/86: 9; Tr. 7/29/86: 67–68. In general, all of the prison officials who testified impressed me as having well-founded and deeply held concerns about the consequences of liberalizing the Commonwealth's capital inmate management policies.

Plaintiffs argue that the proffered security concerns exaggerate the true risks, and

---

**8.** A capital inmate cannot be executed in Pennsylvania unless the Governor signs a warrant. Only two warrants have been signed since the Commonwealth reinstated the death penalty in 1978. Once a warrant is signed, the inmate is moved into what the Commonwealth calls "Phase II." This entails removal of the inmate to an observation cell. Tr. 6/24/86: 65–66. During Phase II, the Commonwealth monitors the inmate constantly and further restricts his privileges.

mistakenly assume that capital inmates pose unique security problems.[9] To support their position, plaintiffs rely on the Commonwealth's capital inmate misconduct records. The misconduct records reflect that nearly 50% of the capital inmates are misconduct free. Ex. D–53. Indeed, many of the PRC records describe a number of capital inmates as "model inmates" or "interacting well with staff." Ex. P–10 to P–44. Additionally, the Commonwealth's records show that the two capital inmates for whom the Governor has already signed warrants, Travaglia and Zettlemoyer, accepted the news quietly. Plaintiffs argue that this evidence refutes the Commonwealth's contention that the signing of a warrant poses a serious security risk, but I am not convinced that these two examples have predictive value.

Finally, plaintiffs contend that since over 40% of the cases involving the death penalty are reversed on appeal, capital inmates have a strong incentive to comply with institutional rules and procedures. The plaintiffs cite the Supreme Court's decision in *Skipper v. South Carolina*, 106 S.Ct. 1669 (1986), which held that the exclusion from the sentencing hearing of testimony, offered by a defendant to establish his good behavior during the seven months of incarceration before trial, deprived him of his right to place relevant evidence in mitigation of punishment before the sentencer. Plaintiffs contend that *Skipper* creates a strong incentive for capital inmates to abide by institutional rules and regulations.

### C. Conclusions

 The critical issue in this case is whether the policies and practices instituted by the Commonwealth in the name of institutional security unconstitutionally compromise plaintiffs' eighth amendment rights. "The Eighth Amendment expresses the revulsion of civilized man against barbarous acts—the 'cry of horror' against man's inhumanity to his fellow man." *Robinson v. California*, 370 U.S. 660, 676, 82 S.Ct. 1417, 1425, 8 L.Ed.2d 758 (1962) (Douglas, J. concurring). More recently, the eighth amendment has been interpreted to require conditions of confinement that comport with "the evolving standards of decency that mark the progress of a maturing society." *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399. (citations omitted). I am not convinced that the conditions of confinement at Graterford and Huntingdon even remotely resemble barbarous acts or offend contemporary standards of decency.

Prison officials are charged with the formidable task of striking the balance between the welfare of the inmates and the safety of the entire prison population. In *Ponte v. Real*, 471 U.S. 491, 497, 105 S.Ct. 2192, 2196, 85 L.Ed.2d 553 (1985), the Supreme Court aptly wrote that prisons are "peopled by those who have been unable to conduct themselves properly in a free society. Many of these persons have scant regard for property, life, or rules of order...." I do not profess to know how to best handle the potentially explosive capital inmate population, but the Supreme Court has made clear that, in the absence of a constitutional violation, the decision of how to manage a prison falls particularly within the province of prison administrators. As the late Chief Judge Luongo noted, in *United States ex rel. Hoss v. Cuyler*, 452 F.Supp. 256, 287 (E.D.Pa.1978), "[m]y task is only to assess the reasonableness of defendants' conduct. Whether defendants have made the best decision or the most nearly correct one is not for me to determine."

---

**9.** The rationales underlying plaintiffs' argument that capital inmates have unique needs, however, support the Commonwealth's position that capital inmates pose unique security risks:

"Death sentenced prisoners face a variety of psychological problems and emotional stresses that are unique to them, or are present in a more intense and concentrated form than in most people. They are plagued with profound uncertainty about their ultimate fate, are highly dependent upon others for their very survival and constantly face the traumatic prospects of execution. These stresses force a variety of psychic reactions and adjustments on death sentenced inmates. Some endure higher levels of tension, greater psychological vulnerability and increased emotional 'brittleness' as compared to prisoners who are not on death row." *Plaintiffs' Trial Brief* at 17–18.

The conditions of confinement at Graterford and Huntingdon do not deprive capital inmates of basic needs. The physical plant, though lacking in some respects, provides adequate shelter. Despite a growing capital inmate population and substantial delays in executing the sentences, Pennsylvania's death row is not beset by overcrowding. Moreover, the Commonwealth has allocated a substantial sum of money to modernize its prisons. The privileges afforded death row residents, while perhaps less than the privileges allowed capital inmates in several other jurisdictions, are reasonable, based on legitimate security concerns, and thus not totally without penological justification. Also, the support services attend sufficiently to the needs of the capital inmates.

Upon review of the evidence adduced at trial, I conclude that psychological disturbances suffered by the plaintiffs are a function of the sentences imposed and not necessarily the conditions of confinement. It should not come as a surprise to anyone that a person awaiting execution would have a tendency to become depressed. Plaintiffs have not established by a preponderance of the evidence that the conditions of confinement have caused psychological injuries. In my judgment, the Commonwealth has adopted responsible policies for the management of capital inmates that reasonably accommodate the needs of the individual prisoners on death row in light of legitimate institutional security concerns. Even if certain of these individuals conduct themselves acceptably and limited incentives exist to promote such behavior, the inescapable fact is that all of the inmates sentenced to death have been convicted of atrocious crimes, are awaiting execution, and thus present unique and immense security concerns. *See* Appendix. It defies common sense to suggest otherwise. Thus, while plaintiffs are naturally distressed by their living conditions, they are far from being uninhabitable. Death row is not a happy place to be, but it is functional. For these reasons, I find no eighth amendment violation.

VIII. *First Amendment Claim*

Apart from their eighth amendment claim, plaintiffs challenge the policy prohibiting congregate religious activities on first amendment grounds. The Commonwealth responds that its policy is based on legitimate institutional security concerns, and thus represents a reasonable restriction of plaintiffs' first amendment rights. The applicable facts and respective positions of the parties are set forth in Section V(A)(2) of this opinion.

In support of their first amendment claim, plaintiffs rely on a recent Third Circuit decision that addressed the issue of whether minimum security prisoners have a right to attend weekly religious services absent evidence that their attendance in the past posed any threat to security. In *Shabazz v. O'Lone*, 782 F.2d 416 (3d Cir.) (en banc), *cert. granted*, ── U.S. ──, 107 S.Ct. 268, 93 L.Ed.2d 245 (1986), two inmates classified as low security risks challenged a policy of a medium security institution that effectively denied the two of their ability to attend weekly religious services. *Id.* at 417. Permitting the challenge to stand, the Third Circuit placed the burden on the state to prove that "the challenged regulations were intended to serve, and do serve, the important penological goal of security, and that no reasonable method exists by which appellants' religious rights can be accommodated without creating bona fide security problems." *Id.* at 420 (footnote omitted). The court held that "[w]here it is found that reasonable methods of accommodation can be adopted without sacrificing either the state's interest in security or the prisoners' interest in freely exercising their religious rights, the state's refusal to allow the observance of a central religious practice cannot be justified and violates the prisoners' first amendment rights." *Id.* (footnote omitted).

The facts in this case do not give rise to a first amendment violation as set forth in *Shabazz*. Plaintiffs have not suggested any reasonable means of providing communal religious services without sacrificing the Commonwealth's interest in security. Indeed, the plaintiffs' request for commu-

nal religious activities could not be reasonably accommodated without jeopardizing the bona fide security concerns of the Commonwealth. Unlike *Shabazz*, which involved inmates classified as minimum security risks, this case involves inmates who present the most profound security problems.

Further, plaintiffs have not introduced any evidence to establish that their sincerely held religious beliefs include participation in communal religious services. Rather, Fahy testified that his interest in attending communal religious services was motivated, at least in part, by a desire to spend more time out of his cell. Tr. 6/16/86: 85–86. I do not read *Shabazz* as requiring the Commonwealth to disprove that a reasonable accommodation could be made to a generalized demand to participate in communal religious services. On this basis, I find that *Shabazz* is distinguishable, and thus does not control the case at bar.

Accordingly, I conclude that plaintiffs' first amendment rights have not been abridged.

## IX. *Access To Courts Claim*

█ In addition to their eighth amendment claim, plaintiffs challenge the restrictions on access to the prison law library on sixth amendment grounds. They allege that the case of Ronald Wheeler, who has exercised his right to represent himself, exemplifies the Commonwealth's denial of meaningful access to the courts and establishes the actual injury suffered by the class. Plaintiffs request direct access to the law library or adequate assistance from persons trained in the law. The Commonwealth contends that its policies have not impermissibly infringed plaintiffs' sixth amendment rights, and relies primarily on the availability of counsel. The applicable facts are set forth in Section VI(C) of this opinion.

In *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977), the Supreme Court reaffirmed "that prisoners have a constitutional right of access to the courts." To protect this right, the Court imposed an affirmative duty on prison authorities to assist inmates in the preparation of legal papers, either by providing libraries or assistance from legally trained persons. *Id.* at 828, 97 S.Ct. at 1498. The Court declared that the right of access is not absolute, however, and may be curtailed to accommodate institutional security interests. *Id.* at 830–31, 97 S.Ct. at 1499. The state, not the inmate, has the right to select among constitutionally adequate alternatives. *Id.* The touchstone of the inquiry is whether inmates are provided with "meaningful access" to the courts. *Id.* at 823, 97 S.Ct. at 1495.

The Third Circuit has interpreted *Bounds* to require that inmates be provided with law libraries or alternative sources of legal knowledge. *Hudson v. Robinson*, 678 F.2d 462 (3d Cir.1982). In a recent unpublished opinion, the Third Circuit ruled that an inmate must show "actual injury," which the court defined as an "instance in which an inmate was actually denied access to the courts," in order to sustain a sixth amendment claim. *Cole v. Fulcomer*, No. 86–5246, slip op. at 3–4 (3d Cir.1986) [808 F.2d 1515 (table)] (quoting *Hudson*, 678 F.2d at 466)). In *Cole*, the court also observed that "[w]e have repeatedly interpreted the Supreme Court's decision in *Bounds* … to require *either* the provision of adequate law libraries *or* the assistance of legally trained persons." *Id.* at 5 (emphasis in original) (citations omitted).

█ In accordance with *Cole*, I find that the Commonwealth has provided capital inmates with meaningful access to persons trained in the law. The plaintiffs have not demonstrated that any capital inmate lacked meaningful access to counsel, and indeed the record indicates that every capital inmate, including Wheeler, has access to counsel. In addition, the Commonwealth provides satisfactory access to attorneys through the mail or by phone, and provides ample stationary supplies. In Wheeler's case, he rejected three court appointed attorneys before reaching the present arrangement with consulting counsel. If he has suffered any injury, it is of his own doing, not because of the Common-

wealth's neglect of his sixth amendment rights.

■ The constitutional right to access does not mandate access to a library for post-conviction motions where other adequate outside legal assistance is available. *Gometz v. Henman*, 807 F.2d 113, 116 (7th Cir.1986); *Milton v. Morris*, 767 F.2d 1443, 1446 n. 2 (9th Cir.1985). In *Gometz*, the Seventh Circuit declared that "although a library may be essential for a prisoner without a lawyer, legal representation is always sufficient. A prisoner with a lawyer on call may not also insist on assistance from fellow prisoners, for the entitlement is to adequate access, not to maximum possible access." 807 F.2d at 116. *See also Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (allowing policy prohibiting inmates from assisting. one another where, as here, state provides reasonable alternative to assist inmates in preparing petitions for post-conviction relief). Moreover, the Commonwealth does not have a duty to provide library access if an inmate decides, as did Wheeler, not to avail himself of adequate alternative services. *Corgain v. Miller*, 708 F.2d 1241, 1250 (7th Cir.1983); *Blake v. Berman*, 625 F.Supp. 1523, 1525 (D.Mass.1986). As I read *Bounds* and its progeny, capital inmates do not have a constitutional right to direct access or to the assistance of other inmates or paraprofessionals, so long as the state provides "adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498. Compare *U.S. ex rel. Para-Professional, et al. v. Robert P. Kane, et al.*, 656 F.Supp. 1099 (E.D.Pa.1987). I am convinced, like the court in *Morrow v. Harwell*, 640 F.Supp. 225, 227 (W.D.Tex.1986), that the objections of the plaintiffs to the modified paging system now in effect at Graterford and Huntingdon stem from a "desire[ ] to double-check their court-appointed attorneys," not from a lack of meaningful access to the courts.

■ In sum, plaintiffs have not shown that they suffered an actual injury. Rather, the Commonwealth has demonstrated that all of the capital inmates have access to counsel. As noted by plaintiffs, over 40% of the capital inmates have had their death sentence reversed on appeal to the Pennsylvania Supreme Court. The record simply does not contain sufficient evidence to support plaintiffs' claim that their fundamental constitutional right of access to courts has been violated.

## APPENDIX

The decision of the court, like the decisions of the prison administrators, must not be made in a vacuum, but rather must give due consideration to the depraved nature of the crimes committed and the "character of the inmates." *Hewitt v. Helms*, 459 U.S. 460, 474, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983). The following list illustrates the history and proclivity for violence of twenty-two death row inmates at Graterford and Huntingdon.

| Inmate | Citation | Facts of Case |
|---|---|---|
| Alfred Albrecht | 510 Pa. 603, 511 A.2d 764 (1986) | Set house on fire killing wife, mother, and daughter. |
| Robert Atkins a/k/a Clifford Smith | 511 Pa. 343, 513 A.2d 1371 (1986) | Shot pharmacist in head at point blank range during armed robbery. |
| George E. Banks | 521 A.2d 1 (Pa. 1987) | Shot and killed thirteen people with semi-automatic rifle, twelve of whom were women and children family members. |
| Leslie Beasley | 505 Pa. 279, 479 A.2d 460 (1984) | While at large for one murder, killed police officer attempting to apprehend him. |
| Roger Buehl | 510 Pa. 363, 508 A.2d 1167 (1986) | Murdered elderly couple and housekeeper, shooting man in |

| Inmate | Citation | Facts of case |
|---|---|---|
| | | heel, abdomen, and cheek, shooting wife in elbow and eye, and shooting housekeeper in head while tied to chair. |
| James H. Carpenter | 511 Pa. 429, 515 A.2d 531 (1986) | Stabbed man in heart on public street without provocation. |
| Charles E. Cross | 508 Pa. 322, 496 A.2d 1144 (1985) | Murdered coworker's wife and two children, mutilating the bodies. |
| Robert Perry Dehart | 512 Pa. 235, 516 A.2d 656 (1986) | After escaping from prison, ambushed victim, killing him with two shotgun blasts to head. |
| Henry P. Fahy | 512 Pa. 298, 516 A.2d 689 (1986) | Raped and brutally murdered young neighbor. |
| Roderick Frey | 504 Pa. 428, 475 A.2d 700 (1984) | Hired man to execute estranged wife. |
| Rodney Griffin | 511 Pa. 553, 515 A.2d 865 (1986) | Shot college student in head for agreeing to testify against friend. |
| Charles P. Holcomb | 508 Pa. 425, 498 A.2d 833 (1985) | Kidnapped, raped, and stabbed victim in neck multiple times. |
| John C. Lesko | 502 Pa. 511, 467 A.2d 307 (1983) | Murdered three people and police officer. |
| Frederick Maxwell | 505 Pa. 152, 477 A.2d 1309 (1984) | Invited salesman into home, robbed him, and shot him twice in head. |
| Otis Peterkin | 511 Pa. 299, 513 A.2d 373 (1986) | Murdered two former coemployees, shooting one fifteen times. |
| Simon Pirela | 510 Pa. 43, 507 A.2d 23 (1986) | Injected victim with battery acid, then strangled him. |
| Alan Lee Pursell | 508 Pa. 212, 495 A.2d 183 (1985) | Viciously beat, burned, and mutilated 13 year old boy. |
| Richard Stoyko | 504 Pa. 455, 475 A.2d 714 (1984) | Shot wife three times with shotgun, then murdered man because "his car was in the middle of the road and he wouldn't move it." |
| Joseph Szuchon | 506 Pa. 228, 484 A.2d 1365 (1983) | Kidnapped girlfriend, then shot her twice in back with rifle. |
| Michael Travaglia | 502 Pa. 474, 467 A.2d 288 (1983) | Murdered three people and police officer. |
| Raymond Whitney | 511 Pa. 232, 512 A.2d 1152 (1986) | Stabbed man during robbery 28 times. |
| Keith Zettlemoyer | 500 Pa. 16, 454 A.2d 937 (1982) | Shot young man twice in neck and twice in chest while handcuffed and lying face down. Victim had agreed to testify against Zettlemoyer in pending felony trial. |